**PHILADELPHIA GEAR
CORPORATION,
Plaintiff-Appellee,**

v.

**CENTRAL BANK, Defendant-Appellant.**

No. 82–3294.

United States Court of Appeals,
Fifth Circuit.

Oct. 17, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 17, 1983.

Wildman, Harrold, Allen, Dixon & McDonnell, J. Stanley McNeese, Memphis, Tenn., Snellings, Beard, Sartor, Inabnett & Trascher, Daniel R. Sartor, Jr., Monroe, La., for defendant-appellant.

Gordon, Arata, McCollam & Stuart, Gerald F. Slattery, Jr., Walter B. Stuart, IV, New Orleans, La., for plaintiff-appellee.

Before GOLDBERG, GEE and RANDALL, Circuit Judges.

GEE, Circuit Judge:

The terrain of the present appeal is a failed business transaction, one that culminated in several and mutual allegations of failure to honor contractual obligations. The contract at issue is a documentary letter of credit.[1] The district court determined that the issuing bank wrongfully dishonored drafts presented pursuant to the letter of credit. In consequence, it ordered the issuer to pay the face value of all drafts presented. Because we conclude that the district court did not strike the correct balance between the parties' competing duties and obligations, we reverse its judgment.

*Background*

On April 23, 1981, Central Bank, appellant, issued a document entitled "Irrevocable Commercial Letter of Credit No. 02408" in the amount of 4.5 million dollars (hereinafter "credit" or "letter of credit"). The credit was issued on behalf of Central's customer United Machinery Services, Inc. ("United") in favor of Philadelphia Gear Corporation ("Philadelphia") as beneficiary. The record reflects that the credit was issued to support Central's obligations to Philadelphia under a sale of goods contract. By its terms, the credit could accommodate individual drafts in maximum amounts of 75 thousand dollars; thereafter to be automatically reinstated to a limit of 4.5 million dollars. Each draft presented pursuant to the credit was required to bear the notation: "DRAWN UNDER LETTER OF CREDIT OF CENTRAL BANK." The record also reveals that each draft was to be accompanied by a copy of the credit. In addition, payment was conditioned upon presentation by Philadelphia's intermediary, Provident National Bank of Philadelphia ("Provident"), of an "inland bill of lading evidencing shipment of any of the above described units to United Machinery, Inc." Contrary to this provision, the credit did not specify the exact nature of the goods to be delivered.[2] More, the credit was expressly

---

1. "A 'documentary draft' or a 'documentary demand for payment' is one honor of which is conditioned upon the presentation of a document or documents. 'Document' means any paper including document of title, security, invoice, certificate, notice of default and the like." La.R.S. 10:5–103(1)(b).

2. In the district court Philadelphia argued that the existence and legal consequences of defects within the proffered bills of lading was a nonissue. We put the issue as follows: A bill of lading is a representation by a transporter that specific merchandise has been delivered for shipment. La.R.S. 10:1–201(2). This representation signals to the issuer that the beneficiary has relinquished title. *Id.* Here, while requiring that a bill of lading accompany each draft, the credit is silent as to the nature or type of goods it is meant to evidence. This omission creates a circumstance where arguably any bill of lading would fulfill the credit's terms. Because the credit is expressed on Central's standard form and because Central is obligated to articulate clearly the precondition of payment, a construction to this effect would be just. *See East Girard Sav'gs Ass'n v. Citizens National Bank and Trust Co.*, 593 F.2d 598, 602 (5th Cir.1979). Philadelphia appears, however, to have abandoned this argument on appeal; instead it sought to meet each of appellant's arguments concerning whether the bills of lading were properly presented. Because the resolution of this issue would alter our analysis,

subject to the Uniform Customs and Practices for Commercial Documentary Credits fixed by the Thirteenth Congress of the International Chamber of Commerce (1974 Revision Publication 290) (hereinafter "I.C.C. Pub. 290").

Sometime during the latter half of 1981 relations between United and Philadelphia soured. United refused to pay for goods which it claimed were not ordered; and Philadelphia, in contradiction, demanded payment—maintaining that the goods were delivered pursuant to contractual agreement. As a result of this dispute Philadelphia, through Provident, tendered six drafts on the letter of credit in late December of 1981. Several days later Central decided that it would not pay the drafts and returned them to Provident with notice to that effect. The notice stated that the drafts were being returned "due to their non-compliance with the terms of the relevant credit." In early January of 1982 Philadelphia tendered three additional drafts on the credit. Again Central refused to pay, in each case citing as its reason general noncompliance with the credit's terms. Undeterred, Philadelphia wired Central requesting a more definite statement of Central's reasons. Central responded that "[t]he reasons for dishonor are as previously stated."

Oblivious to the manifest logic of Central's position, on February 10, 1982, Philadelphia instituted this diversity action for breach of contract in the Western District of Louisiana. Specifically, Philadelphia sought a declaratory judgment that the drafts were payable under the credit, damages for wrongful dishonor, and—because the credit remained a valid contractual obligation—a preliminary and permanent injunction ordering that future drafts be timely paid.[3] Without result the district court attempted to reconcile the parties' differences at pretrial conference. By this time Philadelphia had been made aware of the exact defect in each of the drafts previously tendered. On the eve of trial Philadelphia presented to Central eleven additional drafts with supporting documentation. These were placed in the registry of the court. The record also reflects that throughout trial Philadelphia presented additional drafts; each was placed in the registry.

At the conclusion of all the evidence the district court found: (1) Each of Philadelphia's tendered drafts failed in some respect to conform to the letter of credit; (2) all the defects were curable; (3) some of the deficiencies were known to agents of Philadelphia and Provident; and (4) Central neither returned the supporting documentation to Philadelphia's drafts (submitted before institution of suit) nor informed Philadelphia that it would hold the documentation on file for its inspection. Applying to these findings what it perceived to be the relevant statutory and case law, the district court determined that Central was liable for the face value of all drafts presented and entered judgment in a corresponding amount. Central now appeals that judgment.

### Relevant Standard

Because the resolution of all other issues flows from its determination, the crucial issue of this appeal is whether the district court struck the proper balance between the

yet not disturb the result given the present facts, we simply note that we do not today abandon the principles enunciated in *East Girard, supra.* In this regard we note that appellant's claim is also based upon allegations that: (1) none of the drafts were accompanied by the letter itself, as required; (2) some of the drafts bore unauthorized signatures; (3) some lacked the required notations; and (4) some were in fact photocopies of photocopies, any combination of which would support our result absent the issue we focus upon.

We also note that because the credit was written on Central's own form, no violence is done to the contract in resolving the ambiguities created by that omission against Central. *See Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir.1970). Yet, in so doing we are not required to rewrite the entire contract and its obligations. The credit required the presentation of timely bills of lading to support payment.

**3.** By its terms, the credit expired on April 30, 1982.

parties' competing duties and obligations under the credit. We conclude that it did not. The district court characterized the present case as an action for wrongful dishonor. So doing, it relied extensively on the following provisions of the Louisiana Uniform Commercial Code (hereinafter the "Code") and I.C.C. Pub. 290:

Time allowed for honor or rejection; withholding honor or rejection by consent; presenter

(1) A bank to which a documentary draft or demand for payment is presented under a credit may without dishonor of the draft of credit

(a) defer honor until the close of the third banking day following receipt of the document; and

(b) further defer honor if the presenter has expressly or impliedly consented thereto.

Failure to honor within the time here specified constitutes dishonor of the draft or demand and of the credit.

(2) Upon dishonor the bank may unless otherwise instructed fulfill its duty to return the draft or demand and the documents by holding them at the disposal of the presenter and sending him an advice to that effect.

(3) "Presenter" means any person presenting a draft or demand for payment for honor under a credit even though that person is a confirming bank or other correspondent which is acting under an issuer's authorization.

La.R.S. 10:5–112.

(c) If, upon receipt of the documents, the issuing bank considers that they appear on their face not to be in accordance with the terms and conditions of the credit, that bank must determine, on the basis of the documents alone, whether to claim that payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

(d) The issuing bank shall have a reasonable time to examine the documents and to determine as above whether to make such a claim.

(e) If such claim is to be made, notice to that effect, stating the reasons therefor, must, without delay, be given by cable or other expeditious means to the bank from which the documents have been received (the remitting bank) and such notice must state that the documents are being held at the disposal of such bank or are being returned thereto.

(f) If the issuing bank fails to hold the documents at the disposal of the remitting bank, or fails to return the documents to such bank, the issuing bank shall be precluded from claiming that the relative payment, acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

I.C.C. Pub. 290 art. 8(c)–(f).

Against the background of these provisions, the district court first reasoned that at all times pertinent to the present case Provident was a presenter as defined by La.R.S. 10:5–112 and a remitting bank as defined by article 8(e) of I.C.C. Pub. 290. In consequence, Central was obliged to inform Provident of the precise reasons it considered the tendered documents to be nonconforming. *See* I.C.C. Pub. 290, arts. 8(c), (e). Concluding in each instance that Central failed to meet this obligation, the district court determined that Central was estopped to raise the documents' deficiencies as a defense, the requirement of strict compliance with the terms of letters of credit notwithstanding. *Cf. Flagship Cruises, Ltd. v. New England Merchants Nat'l Bank,* 569 F.2d 699 (1st Cir.1978). More, the district court reasoned that estoppel was proper because Central's failure either to return the drafts' supporting documentation or to give notice that it was being held at Provident's disposal violated article 8(f) of I.C.C. Pub. 290, thwarting any attempt to cure the drafts' defects.

While the above analysis is plausible, it is incomplete. The primary flaw in this analysis is its approach to the concept of dishonor in credit transactions. The district court focused upon the duty of the issuer to pay, finding Central's performance wanting in this respect. It appears to us, however,

that in the first instance dishonor puts at issue the adequacy of the *beneficiary's* performance under the letter of credit. While the adequacy of that performance must be examined in light of the issuer's corresponding duties, it must always remain the primary focus of analysis. We reach this conclusion by tracing the contours of a credit transaction.

■ Such a transaction usually comprises three separate contracts: "[f]irst, the issuing bank enters into a contract with its customer to issue the letter of credit. Second, there is a contract between the issuing bank and the party receiving the letter of credit. Third, the customer who procured the letter of credit signs a contract with the person receiving it, usually involving the sale of goods or the provision of some service." *East Girard Sav. Ass'n v. Citizens National Bank, Etc.,* 593 F.2d 598, 601 (5th Cir.1979); *see also* note 5, *infra.* The obligations and duties created by the contract between the issuer and the credit's beneficiary are completely separate from the underlying transaction, with absolutely no consequence given the underlying transaction unless the credit expressly incorporates its terms. *See* La.R.S. 10:5–109. In consequence, the issuer's duty to pay is conditioned solely upon the credit's terms: usually, as here, the beneficiary's presentation of facially conforming documents. *Id.,* 10:5–114; *see also* Harfield, *Bank Credits and Acceptances* at 73–86 (1975) (hereinafter cited as "Bank Credits and Acceptances"). More, the issuer has no obligation to go beyond a facial examination of the tendered documents in determining whether payment is warranted and, in fact, may incur liability if he does so.[4] *Id.; see also Sisalcords do Brazil, Ltd. v. Fiacao Brasileira de Sisal, S.A.,* 450 F.2d 419 (5th Cir. 1971); *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461 (2d Cir.1970). In addition, the issuer's promise to pay under the credit is irrevocable. In concert, these features facilitate economic exchange by providing the beneficiary a source certain of payment in the event the issuer's customer refuses to pay.[5] *See generally,* Comment,

---

**4.** Except in certain limited and specified instances, an issuer must honor facially complying documents:

**Issuer's duty and privilege to honor; right to reimbursement**

(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary. The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it.

(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title or of security or is forged or fraudulent or there is fraud in the transaction

 (a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course and in an appropriate case would make it a person to whom a document of title had been duly negotiated or a bona fide purchaser of a security; and

 (b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the document but a court of appropriate jurisdiction may enjoin such honor.

(3) Unless otherwise agreed an issuer which had duly honored a draft or demand for payment is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit.
La.R.S. 10:5–114.

**5.** A letter of credit contract is a bilateral agreement between the issuer and its customer where the customer makes certain obligations in consideration of the issuer's issuance of the credit. While the beneficiary is not a direct party to this transaction, it is a protected party. To this end, La.R.S. 10:5–106 provides:

 (1) Unless otherwise agreed a credit is established

 (a) as regards the customer as soon as a letter of credit is sent to him or the letter of credit of an authorized written advice of its issuance is sent to the beneficiary; and

 (b) as regards the beneficiary when he receives a letter of credit or an authorized written advice of its issuance.

" 'Unless Otherwise Agreed' and Article 5: An Exercise in Freedom of Contract," 11 St. Louis L.J. 416 (1967).

 Since an issuer's duty to pay arises exclusively from the terms of the credit, with no defenses beyond those terms, its liability turns on whether the beneficiary has performed in accordance with the terms and conditions of the credit. *See Courtaulds North America, Inc. v. N.C. Nat. Bank,* 528 F.2d 802, 805 (4th Cir.1975). The documentation necessary to support payment has the beneficiary as its source and must conform exactly to the requirements of the credit; otherwise the issuer is entitled to refuse payment. *See East Girard, supra; Wing On Bank Ltd. of Hong Kong,* 457 F.2d 328 (5th Cir.1972). *See also* Note, Documentary Letters of Credit and the Uniform Customs and Practice for Documentary Credits (1974 Revision): A Selective Analysis, 3 J.Corp.L. 147 (1977); Harfield, "Code, Customs and Conscience in Letter of Credit Law," 4 Uniform Commercial Code L.J. 7 (1971).

 This doctrine of strict compliance is firmly grounded in commercial reality. In the event payment is made upon presentations that do not conform to the credit, the issuer loses its right to reimbursement from its customer. *See* J. White & R. Summers, Uniform Commercial Code § 18.7 at p. 742–43 (1972) (hereinafter cited as "J. White & R. Summers"). In this event the beneficiary's debt is satisfied and the customer escapes liability on both the underlying and letter of credit contracts while the issuer incurs a corresponding liability—without defense or recourse. More, the rejection of strict compliance as a doctrine would vitiate the economic value of a credit transaction; for not only would the issuer be compelled to assume the risks of the underlying contract's nonperformance, it would also be required to assume the additional risks of judicial realignment of its obligations under the credit:

> [T]he peculiar values of the letter of credit are (1) that they provide the assurance of payment, (2) that they can provide that assurance in respect to any transaction, and (3) that they are inexpensive. These values will be lost if performance of the letter of credit is to be infected by the nonperformance of the underlying transaction because *when* that happens the letter of credit is not an assurance of payment and because *if* that happens the cost of a letter of credit must include the issuer's problematic litigation expense.

Harfield, The Increasing Domestic Use of the Letter of Credit, 4 Uniform Commercial Code L.J. 251, 257 (1972) (emphasis in original). There can be no wrongful dishonor where the drafts presented are nonconforming and the issuer gives timely and sufficient notice to that effect. *See* La.R.S. 10:5–112, 114. Because it is undisputed that Philadelphia received timely notice of nonpayment, accompanied in each instance by a statement that payment was refused because of Philadelphia's noncompliance with the terms of the credit, our inquiry must focus upon the sufficiency of Central's notice.

 Central contends and the district court found that there were substantial irregularities in Philadelphia's first ten presentations. *See supra* note 2. The record reflects that six were accompanied by photocopies of "shipping evidences" or "shipping notices" rather than the required inland bills of lading. In addition, the ship-

---

(2) Unless otherwise agreed once an irrevocable credit is established as regards the customer it can be modified or revoked only with the consent of the customer and once it is established as regards the beneficiary it can be modified or revoked only with his consent.

(3) Unless otherwise agreed after a revocable credit is established it may be modified or revoked by the issuer without notice to or consent from the customer or beneficiary.

(4) Notwithstanding any modification or revocation of a revocable credit any person authorized to honor or negotiate under the terms of the original credit is entitled to reimbursement for or honor of any draft or demand for payment duly honored or negotiated before receipt of notice of the modification or revocation and the issuer in turn is entitled to reimbursement from its customer.

ping documents accompanying the first ten presentations were stale. Article 41 of ICC Pub. 290, incorporated by reference into the credit, provides that "[i]f no ... period of time is stipulated in the credit, banks will refuse documents presented to them more than 21 days after the issuance of the Bills of Lading or other shipping documents." The district court found that Philadelphia was aware of "some" of these defects at the time of presentation. With respect to the drafts that Philadelphia knew to be defective, we hold that Central's notice was not deficient and that the district court erred in concluding that it wrongfully dishonored these drafts.

Philadelphia does not seriously dispute the facts we have stated. Instead, it presents a three-tiered argument designed to vitiate their impact. First, it urges that because the shipping documents were stale by virtue of an agreement between it and United, Central was required to seek United's approval prior to dishonor. Next, it contends that the defects were curable because it could have reshipped the goods, generating fresh bills of lading, had Central permitted United to return the shipped merchandise. Finally, Philadelphia urges that Central possessed an unqualified duty to notify it of the precise defects within its drafts and that absent such notice liability must attach. We believe this argument to be without merit.

 As noted above, a letter of credit and the underlying contract are completely separate agreements, and the issuer may not use the terms of the underlying transaction as a defense unless the credit expressly incorporates its terms. It follows that an underlying contract may not be used to amplify the terms of a credit not expressly incorporating them. It further follows that because the underlying transaction does not affect the credit, any proof concerning a particular custom or course of dealing between the issuer's customer and the beneficiary within the underlying transaction cannot cure the apparent nonconformity of a required document. *See* La.R.S. 10:5–109.

Nor are we persuaded that custom requires an issuer, in every instance, to notify its customer before rejecting nonconforming drafts. We find nothing in the Code or I.C.C. Pub. 290 that warrants such a result.

 Louisiana law provides that: "[a] course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." La.R.S. 10:1–205(3). Concomitantly, that law imposes an obligation of good faith in the performance of every contract. *Id.,* 10:1–203. Here it is undisputed that I.C.C. Pub. 290 reflects a codification of accepted banking practice. Article 3(c) of that publication provides that "[an irrevocable letter of credit] can neither be amended nor cancelled without the agreement of all parties thereto." This language is precise in its meaning and requires no interpretation. Because Central has obviously chosen to decline Philadelphia's invitation to modify the credit, the only inquiry is whether good faith—required by the law of Louisiana—imposes a duty beyond both custom and the credit's terms. We believe not. Good faith "means honesty in fact in the conduct or transaction concerned." La. R.S. 10:1–201(9). Nothing in the record suggests that Central acted dishonestly in any aspect of the present transaction. We are not prepared to hold that the timely rejection of a facially nonconforming draft constitutes an act of bad faith. *See Corporacion de Mercadeo Agricola v. Mellon Bank International,* 608 F.2d 43, 49 (2d Cir.1979). Nor are we prepared to lay it down that good faith imposes a duty to rewrite a contract where there is no hint of unconscionability or fraud. We recognize that issuers often consult their customers before rejecting nonconforming drafts submitted under a credit:

> It must not be thought that every instance of alleged noncompliance generates a dispute leading to wrongful dishonor. When doubts arise in the issuer's mind as to whether or not a presentment

complies, it is not at all uncommon for the issuer to reach an agreement whereby the customer in effect waives the alleged noncompliance or makes some other adjustment so that the occasion for the beneficiary to assert wrongful dishonor does not arise.

J. White & R. Summers, *supra* § 18.6 at p. 623. Doubtless such a course of action is good commercial etiquette; we cannot, however, require it where the terms of the credit do not.

Appellee's second and third points we treat together, since even assuming that the defects in the documentation submitted to Central were curable, we are unable to conclude that the district court's judgment was correct. To answer these compounded issues we must determine the legal consequences where a beneficiary knowingly submits nonconforming documents. The credit clearly permits the issuer to refuse payment on drafts accompanied by bills of lading more than 21 days old. *See* I.C.C. Pub. 290, article 41. Central refused payment on the ground that each draft failed to comply with the credit and declined to furnish Philadelphia with any amplifying information. At oral argument, Central asserted that the drafts were rejected because the bills of lading were stale. *See supra* note 2. By the district court's analysis, however, although Philadelphia knew at least some of the drafts to be nonconforming when tendered, Central was required to specify its reasons for refusing payment irrespective of Philadelphia's knowledge.

■ Our reading of the relevant case law and commentaries confirms that at its essence a credit is a peculiar form of executory contract, one whereby the issuer makes a continuing offer to pay upon the beneficiary's performance of the terms and conditions stipulated in the credit. *See* J. White & R. Summers, *supra,* § 18.2 at p. 711–715 (and cases cited there). In consequence, an issuer's obligation to pay is wholly conditioned upon the beneficiary's performance, here, the delivery of specified documents. Further, nonpayment by the issuer gives rise to an action by the beneficiary for breach of contract in which the beneficiary must plead and prove due performance on its part. *Id.* As stated above, due performance may be demonstrated only by a showing of compliance with the credit's terms.

■ As we have noted above, the Code incorporates a standard of good faith in every contract made pursuant to its injunctions. La.R.S. 10:1–203. That standard requires honesty in fact in the conduct or transaction concerned. *Id.,* 10:1–201(9). Section 10:5–111 of the Code provides that a beneficiary warrants, in presentation, that its drafts conform to the conditions of the credit.[6] By knowingly tendering nonconforming drafts, Philadelphia breached both of these provisions. It would be a strange rule indeed under which a party could tender drafts containing defects of which it knew and yet attain recovery on the ground that it was not advised of them. *See District of Columbia v. Moulton,* 182 U.S. 576, 21 S.Ct. 840, 45 L.Ed. 1237 (1901). For these reasons, we conclude that the district court's judgment was in error regarding those drafts in which the deficiencies were known. We do not hold today that a beneficiary may never prevail where its supporting documentation fails to meet the credit's requirements but only that, upon the present facts, the beneficiary has failed so abysmally in meeting its contractual obligations that no inquiry beyond that failure is required.

---

**6. Warranties on transfer and presentment**
(1) Unless otherwise agreed the beneficiary by transferring or presenting a documentary draft or demand for payment warrants to all interested parties that the necessary conditions of the credit have been complied with. This is in addition to any warranties existing under the law.

(2) Unless otherwise agreed a negotiating, advising, confirming, collecting or issuing bank presenting or transferring a draft or demand for payment under a credit warrants only the matters warranted by a collecting bank under Chapter 4.
La.R.S. 10:5–111.

We also find little substance in Philadelphia's contention that the present case is best treated as one for injunctive relief. Because a letter of credit transaction deals solely with the payment of monies there can be no argument that no adequate remedy exists at law. *See Productos Carnic S.A. v. Cent. Am. Beef, Etc.*, 621 F.2d 683 (5th Cir.1980). Next, to our reading the Code contemplates judicial intervention only in narrowly proscribed circumstances: (1) where the issuer's customer seeks to enjoin payment, La.R.S. 10:5–114(2)(b), or (2) where the issuer wrongfully cancels or repudiates a credit prior to presentment or a demand for payment, *id.*, 10:5–115(2).[7] In the former, judicial intervention is predicated upon allegations of fraud and a corresponding fiction. *See Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 31 N.Y.S.2d 631 (Sup.Ct.1941). The fiction provides that although the documents are facially complying, they are in fact noncomplying as a result of the fraud, thus preserving the doctrine that the issuer's duties are defined exclusively by the credit. *See Old Colony Trust Co. v. Lawyers Title and Trust Co.*, 297 F. 152, 158 (5th Cir.1923); *see also* Harfield, Enjoining Credit Transactions, *supra* at 602.

As to the latter circumstance, because the Louisiana court has yet to make its views known, our analysis relies upon the language of the Code:

> When an issuer wrongfully cancels or otherwise repudiates a credit before presentment of a draft or demand for payment drawn under it the beneficiary has the rights of a seller after repudiation by the buyer if he learns of the repudiation in time reasonably to avoid procurement of the required documents. Otherwise the beneficiary has an immediate right of action for wrongful dishonor.

La.R.S. 10:5–115(2). It appears to us that the above language contemplates a factual pattern where a beneficiary is either prevented from performing because of the issuer's wrongful repudiation of a credit or because presentment would be a needless exercise in view of the issuer's past conduct. It follows that a beneficiary must establish a case of wrongful repudiation. And even in so doing, a court could go no further than to compel the issuer to honor the terms of its agreement. Here appellee has submitted no evidence to that end. An issuer is not compelled to rewrite the terms of a credit so as to acquiesce to substantial compliance, if in fact that is our case. The short of the matter is that every one of

---

**7.** As one commentator has characterized it: '[t]he idiosyncratic character of the letter of credit transaction necessarily minimizes the number of cases in which judicial intervention is appropriate.' Harfield, Letters of Credit at 73 (1979). Our research has revealed no instances of judicial intervention in these transactions absent allegations of fraud. By our reasoning this is in deference to the peculiar inflexibility of a credit transaction and the inability of courts to function as effective referees prior to dishonor or some egregious circumstance in light of the Code's mandate to honor facially complying drafts:

> The Code's *general principle* is that the 'issuer must honor a draft or demand for payment that complies with the terms of the relevant credit.' The issuer who refuses payment wrongfully dishonors unless it can show either (1) that the documents presented for payment do not comply with the terms of the relevant credit or (2) that the case falls into an exception to the foregoing general principle.
> When does a presentment comply with the terms of the relevant credit? This question is

crucial, for the issuer's refusal to pay a complying presentment generally constitutes wrongful dishonor entitling the beneficiary to some remedy. Most of the letter of credit court cases have arisen over whether a particular presentment complied with the terms of the relevant letter of credit. When Article Five was being drafted, various individuals urged that it include specific rules on what constitutes compliance with the terms of a letter of credit. Wisely the drafters ignored these urgings. Section 5–114(1) merely requires that issuer honor a draft or demand for payment 'which complies with the terms of the relevant [letter of] credit ....' Whether there is compliance in a particular case cannot be soundly dictated in advance by general rules of law, at least if the parties are to have broad freedom of contract to prescribe the particular terms of the letter of credit. But as an alternative, the Code should have specified whether strict compliance is necessary or whether 'substantial performance' will do.

J. White & R. Summers, *supra* § 18–6 at 729 (footnotes omitted).

appellee's drafts was nonconforming. To the extent that appellee had knowledge of this, there can be no argument of wrongful repudiation.

■ As noted above, the district court found only that Philadelphia knew of "some" of the defects in the presented drafts:

> All drafts submitted to Central by Philadelphia failed to conform to the requirements of the letter of credit in various respects. Some of the deficiencies were known to agents of Philadelphia and Provident. All of these defects were curable.

Our review of the record indicates that the court did not clearly focus on this aspect of the case. In Philadelphia's brief to us, it twice speaks of the "fact" that it knew that the documents accompanying the earlier drafts were stale, and the district court's opinion observes that Philadelphia did not seriously dispute that it knew of defects in all the drafts. Since knowledge of the defects is crucial under our holding, we think the best course is to remand. We do so, directing the district court to determine *which,* rather than *some,* of the presentations contained deficiencies known to the presenter at the time of presentation, and to enter judgment accordingly.

For the reasons stated above, the judgment of the district court is reversed and remanded for further proceedings. In consequence, we do not reach the parties' arguments concerning the proper allocation of damages in credit transactions.

REVERSED and REMANDED.

GOLDBERG, Circuit Judge, dissenting:

Ever mindful of the persuasive force of the majority opinion, I must, nonetheless, dissent. The majority faults the district court for being unduly attentive to the issuing bank's duty to pay a draft under a letter of credit rather than the beneficiary's duty to comply strictly to the terms of the letter of credit. I fear that the majority has similarly been unduly attentive to the facts of this case and has uttered a rule insufficiently sensitive to the day-to-day use of letters of credit.

Briefly stated, the case's present posture is as follows: Central Bank issued a letter of credit of which Philadelphia Gear was the beneficiary. The letter of credit incorporated by reference two important terms:

> (e) If [the issuing bank claims a draft is not in compliance with the terms of the letter], notice to that effect, stating the reasons therefore, must, without delay, be given by cable or other expeditious means to the bank from which the documents have been received (the remitting bank) and such notice must state that the documents are being held at the disposal of such bank or are being returned thereto.

> (f) If the issuing bank fails to hold the documents at the disposal of the remitting bank, or fails to return the documents to such bank, the issuing bank shall be precluded from claiming that the relative payment acceptance or negotiation was not effected in accordance with the terms and conditions of the credit.

International Chamber of Commerce Pub. 290 art. 8(e), (f). Philadelphia Gear submitted defective drafts to Central Bank under this letter of credit, knowing that "some" of the drafts were defective. Central Bank dishonored the drafts, offering no explanation other than noting that the drafts were not in compliance with the letter of credit; Central Bank also failed to return promptly the drafts with supporting documentation or to hold them at the disposal of the remitting bank.

Philadelphia Gear sued Central Bank for wrongful dishonorment. The district court held that Central Bank was estopped from asserting defects in the drafts as a defense for two separate reasons. First, Central Bank failed to give notice to Philadelphia Gear of the specific defects; second, Central Bank did not return or hold at the disposal of the remitting bank the drafts and supporting documentation. The panel today holds that a knowing tender of defective drafts absolves the issuing bank of its duty to give notice of the defects and of its duty to return the drafts and supporting documentation; the panel remands for a

determination of which drafts were knowingly defectively submitted. I believe this rule to be inadvisable for two reasons.[1]

First, although the majority's rule might be an equitable treatment of the present litigants, it introduces a factor treading on the toes of principles basic to letters of credit. Letters of credit are near-mechanical forms of payment designed to facilitate commercial exchange. The terms of letters of credit and applicable laws choreograph an elaborate dance. As long as the steps are followed, payment also follows. There is no need to make inquiries into the underlying transaction; the parties need merely pirouette down the path prescribed by the letter and applicable statutes. Facial compliance is the watchword.

The procedures relating to dishonoring a draft are equally choreographed. One of the important turns in that dance is providing the beneficiary an opportunity to correct a defective draft. I.C.C.Pub. 290 arts. 8(e), (f) delineates two steps in this turn: an issuing bank must return the defective draft and give specific notice of the defects. These two steps are crucial to allowing an innocent beneficiary an opportunity to cure an inadvertent error in a draft. Though this motivation is less compelling when the beneficiary knew beforehand of the defects,[2] the steps are still part of the dance.

An inherent advantage of letters of credit is that questions regarding dishonorment are easily answered—a court or potential litigant need merely look to the choreography and see if the dancers took the proper steps. This usually poses an objective question, with the answer obvious from the face of the documents and the terms of the letter of credit. The rule the majority has chosen to apply to this case injects into the otherwise mechanical and simple inquiry that most subjective issue of the knowledge of the beneficiary.

The result of the majority's rule does not clearly offend me in the case in which the beneficiary in fact knowingly presented defective drafts—as I mentioned earlier, the opportunity-to-cure rationale is not overly compelling in such cases. What deeply disturbs me is that the majority has encouraged dishonoring banks to remain silent as to their reasons, stonewalling and injecting a complex, subjective, litigable issue into *every* wrongful dishonorment. Henceforth defendant issuing banks will include in their responsive pleadings the boilerplate *Philadelphia Gear* defense: "Furthermore,

---

1. The majority rule contains some ambiguities that are undesirable, but that are not pertinent to my major objections. First, it is not clear to me what type of knowledge is required. Consider the following situations:
 1. The supporting documents are voluminous and the beneficiary knows to a moral certainty that they must contain some errors somewhere.
 2. The beneficiary suspects that a term in the draft is not in compliance, but is not sure.
 3. The day after presentment the beneficiary discovers an error.
 I am not sure what result the majority rule would command in these three instances.
 A second problem may arise if the negative pregnant of the majority rule is true—if the beneficiary did not know of an error, the issuing bank is estopped from relying on that defect to justify dishonorment. Consider the situation in which (1) a draft contains two errors; (2) the beneficiary knows of error # 1; (3) the issuing bank dishonors the draft without notice of reasons; (4) the beneficiary cures error # 1 and resubmits the draft. Is the bank then es-

topped from dishonoring because of the unknown and uncured error # 2?
 Presumably, these are questions the majority would postpone for cases in which they are outcome determinative. That postponement, however, merely contributes to the uncertainty that the majority has injected into a device specifically created to remove uncertainty from commercial transactions.

2. In support of its key argument on this point, the majority relies solely upon *District of Columbia v. Moulton,* 182 U.S. 576, 21 S.Ct. 840, 45 L.Ed. 1237 (1901). The Court held in that case, *inter alia,* that it was not necessary for the District of Columbia to give notice of the danger to horses inherent in steam rollers. Being a dutiful circuit judge, I am, of course, bound by applicable Supreme Court precedent.
 I believe, however, that *Moulton* is factually distinguishable from the case at bar. It is the nature of steam rollers to have but limited mobility on commercial roads. Letters of credit, in contrast, are by nature intended to traverse the pathways of commerce with near supersonic speed. Accordingly, I do not believe *Moulton* controls.

**242**

the beneficiary knew of the defects at the time of submission." What was once a rigidly choreographed dance now contains a *grand jeté* to the psychoanalyst's couch to look inside the beneficiary's head.

My second major objection to the majority opinion is that it judicially alters the terms of the agreement between the parties before us. I.C.C.Pub. 290 art. 8(e) specifically requires a dishonoring issuing bank to give notice of the reasons for dishonorment and to return the draft and documentation. Article 8(f) even prescribes a sanction for failure to return the draft and documentation (upon which the trial court understandably based its decision). Nowhere is the issuing bank excused from its obligations by the state of mind of the beneficiary. The majority rule has simply engrafted a new term into the parties' agreements. This judicially imposed condition renders somewhat suspect the majority's nominal obeisance to the principle of free contracting.

Though the instant case is a diversity case and "writing in diversity we write on the wind," *Thompson v. Johns-Manville Sales Corp.,* 714 F.2d 581 at 583 (5th Cir. 1983) (Gee, J.), the precedential force of the majority opinion is likely to be great considering the field of law and the stature of the author. It distresses me to think that the once useful device of letters of credit may be a less reliable device now. The previously impossible possibility of contentious litigation of a subjective element can now arise in every suit for wrongful dishonorment. Accordingly, I must leave the majority to their *pas de deux* and *glissade* offstage, dissenting.