THIAGARAJAR MILLS,
LTD., Plaintiff,

v.

Louis W. THORNTON, III; Thornton &
Company, Inc.; Peregrine Interna-
tional Trading, Inc.; Standard Char-
tered Bank; and Alton E. Blakely,
Defendants.

No. 96–3066 G/V.

United States District Court,
W.D. Tennessee,
Western Division.

March 22, 1999.

K. Jayaraman, Memphis, TN, for Plaintiff.

Bobby Leatherman, Armstrong, Allen, Memphis, TN, for Defendants Louis W. Thornton III, Thornton & Co., Inc.

Martin Domb, Hill, Betts & Nash LLP, New York, NY, Gregory G. Fletcher, Michael C. Patton, Baker, Donelson, Berman & Caldwell, Memphis, TN, for Defendant Standard Chartered Bank.

## ORDER GRANTING DEFENDANT STANDARD CHARTERED BANK'S MOTION FOR SUMMARY JUDGMENT

GIBBONS, District Judge.

Before the court is the motion of defendant Standard Chartered Bank ("SCB") for summary judgment on all claims brought by plaintiff Thiagarajar Mills, Ltd. Plaintiff filed its action against defendants Louis W. Thornton, III, and Thornton & Company ("T & C"), a corporation owned and controlled by Thornton, on October 6, 1996. Plaintiff filed an amended complaint on June 17, 1997, in which it added defendants Standard Chartered Bank, Peregrine International Trading Inc. (a second corporation owned and controlled by Thornton), and Alton E. Blakely. Plaintiff alleges that it, together with certain other cotton mills, was the victim of fraud perpetrated by defendants when Peregrine contracted to sell plaintiff "raw cotton" but instead shipped plaintiff worthless "raw cotton lint." Plaintiff seeks relief against SCB under Tennessee state law for fraud, conspiracy to defraud, and violations of the Tennessee Consumer Protection Act, T.C.A. § 47–18–101 *et seq.* Plaintiff additionally alleges that SCB, together with the other defendants, engaged in racketeering activity in violation of the federal civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

Plaintiff is an operator of textile mills, and is incorporated and maintains its principal place of business in Madurai, India. Defendant SCB is a banking institution organized under the laws of England with offices in New York. Defendant Thornton, a resident of Tennessee, owned and operated defendants T & C and Peregrine, the latter incorporated in the British Virgin Islands ("BVI") in August 1994.

In 1994 and 1995, Thornton entered into a series of fraudulent transactions: the Thai transaction; the Kohinoor transaction; and the Thiagarajar and Loyal transaction. SCB performed certain international banking services involving letters of credit and documentary collections for and at the request of Thornton, T & C, and Peregrine in these three separate transactions. Plaintiff Thiagarajar, a participant in the third and final transaction, alleges that SCB knew of Thornton's fraud in the first two transactions and should have disclosed this fraud to plaintiff. Plaintiff further alleges that SCB breached several other duties in connection with its transaction including failing to disclose that Thornton only had a limited power of attorney to act on behalf of Peregrine. SCB does not contest that Thornton was engaged in fraudulent practices, but argues that it had no knowledge of Thornton's fraud and properly performed its limited banking services.

In the first transaction, the Thai transaction, Thornton, acting as the agent of Peregrine, contracted to sell "raw cotton"

to three Thai weaving mills, Bangkok Weaving Mills, Ltd., Kangwal Textile Co. Ltd., and Numkai Chemical Co. Ltd. To carry out his fraud, Thornton then contracted with Finnish suppliers, Jorma Ketonen of TMI IMO and Pekka Vehamaa of Etumaa Oy, to purchase twenty-three containers of inferior "raw cotton lint (cotton linter)" and shipped this inferior cotton to the Thai buyers. (Pl. Resp., Ex. 9; Castadot Decl. ¶ 13).

On November 21, 1994, SCB agreed to act as an advising and negotiating bank in connection with five letters of credit[1] issued by three Thai banks with respect to the shipment of cotton to the Thai mills. (Castadot Decl. ¶ 6; Ex. 1). The letters of credit expressly provided that they were subject to the Uniform Customs and Practices for Documentary Credits (the "UCP"). 1993 Revision, International Chamber of Commerce, Publication No. 500. As an advising and negotiating bank under the letters of credit, SCB's responsibilities were: (a) to notify the beneficiary (Thornton's company, Peregrine) of the letters of credit; (b) to review the documents submitted to SCB under those letters of credit by or on behalf of the beneficiary (Peregrine), in order to determine whether the documents complied with the requirements of the letters of credit; (c) if SCB found discrepancies in the documents, to inform the parties of discrepancies and request their instructions; and (d) if there were no discrepancies, or if they were waived or properly corrected, to make payments under the letters of credit as instructed by the beneficiary (Peregrine), and obtain reimbursement from the issuing banks. (Id. ¶ 8).

On or about December 21, 1994, SCB received documents from Peregrine and reviewed the documents to determine whether they complied with the requirements of the letters of credit. The documents required by the letters of credit included a bill of lading, a packing list, a "phytosanitary certificate," a beneficiary's certificate (from Peregrine), and a commercial invoice from Peregrine. (Id. ¶ 20–21). SCB determined that the documents complied and made payments to Peregrine. SCB then forwarded to the issuing banks the original documents, informed them of the amounts which SCB had paid out under the letters of credit, and requested reimbursement for such payments. (Id.).

On February 1, 1995, the goods were delivered to the Thai mills. Upon discovering that the cotton shipped was not raw cotton but worthless cotton lint, the mills lodged a complaint against Thornton and T & C before the American Cotton Shippers Association. Subsequently, the Thai Mills obtained an arbitration award of $573,-789.80 against T & C before the Liverpool Cotton Exchange. (Pl.Resp., Ex. 7). There is no evidence, however, that the Thai mills' dissatisfaction with the shipment or the subsequent awards against Thornton were ever communicated to SCB.

In the second transaction, the Kohinoor transaction, Thornton's company, Peregrine, contracted with Kohinoor, the owner of Pakistani textile mills, for the sale of raw cotton. Thornton again contracted with Vehamaa of Etumaa Oy to purchase an additional nineteen containers of inferi-

---

**1.** A letter of credit "is a common payment mechanism in international trade that permits the buyer in a transaction to substitute the financial integrity of a stable credit source (usually a bank) for his own." *Alaska Textile Co. v. Chase Manhattan Bank,* 982 F.2d 813, 815 (2d Cir.1992). The letter of credit typically works as follows: The buyer and seller enter into a sales contract requiring issuance of a letter of credit. The buyer gets its bank to issue an irrevocable letter of credit for the benefit of the seller. The letter is an obligation by the bank to honor all drafts drawn upon it by the seller so long as certain required documents—such as a bill of lading, inspection certificate, invoice, and insurance certificate—accompany the draft upon presentment, and so long as the documents appear on their face to be in order. B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 14.01[1] at 14–4 (Rev. ed.1999).

or cotton lint for delivery to Kohinoor. (Pl.Resp., Ex. 9). In this transaction, SCB acted as a "confirming" and negotiating bank under six letters of credit totaling more than $14 million dollars. The letters were issued by two Pakistani banks, on the application of Kohinoor, and Peregrine was again designated as the beneficiary. The letters of credit expressly provided that they were subject to the UCP. (*Id.*, Ex. 7). A "confirming" bank under a letter of credit has the same obligations as an issuing bank, and must pay under the letter of credit when documents are presented to it that conform on their face with the requirements of the letter of credit. (*Id.* ¶ 27). *See Clark, supra,* at 14.02[6], 14.04[1][b].

In February 1995, shortly after being asked to confirm the $14 million under the letters of credit, Muriel Castadot, the SCB officer principally responsible for communicating with Thornton and Peregrine, asked Thornton and Peregrine to provide a written power of attorney authorizing Thornton to act with respect the letters of credit as to which Peregrine was named beneficiary. In late February 1995, SCB received the power of attorney. SCB also took a number of steps to confirm the legitimacy of Thornton's power of attorney. SCB obtained independent confirmation from Dun & Bradstreet of Peregrine's incorporation and representation in the British Virgin Islands. Castadot spoke with an officer at Havelet Trust Company (BVI) Limited, Peregrine's registered agent. Finally, when SCB's outside counsel reviewed and raised various questions about the power of attorney, Castadot spoke with the outside counsel until Castadot was satisfied that the power of attorney was adequate and that Thornton was duly authorized to act on behalf of Peregrine. (Castadot Decl. ¶ 46–51; Ex. 21–23).

On July 13, 1995, SCB received documents submitted under one of the six letters of credit issued by National Bank of Pakistan. The total amount of the letter of credit was $3,792,000, and the Peregrine invoice and sight draft totaled $894,352.70, a portion of the total amount of the letter of credit. The documents included a bill of lading, Peregrine's commercial invoice and a sight draft. On that same day, SCB inspected the documents and determined that they did not conform on their face to the letter of credit. SCB notified the National Bank of Pakistan, advising it of five discrepancies. (*Id.* ¶ 30–32; Ex. 9, 10). On July 24, 1995, National Bank of Pakistan notified SCB that Kohinoor had waived the five discrepancies and authorized SCB to pay Peregrine the invoice amount of $894,352.70. (*Id.* ¶ 36; Ex. 14). In accordance with the waiver, that same day, SCB negotiated the documents under the letter of credit and paid out the amount as instructed by Peregrine. SCB then sought and received reimbursement from the National Bank of Pakistan after sending it the original documents for endorsement. (*Id.* ¶ 37; Ex. 15–17). Of the amount paid to Peregrine, SCB received a standard percentage fee of $30,572.94, the largest portion of which, $28,440, was the fee for confirming the letter of credit for $3,792,000. (*Id.*, Ex. 18). The National Bank of Pakistan also informed SCB that Kohinoor had canceled the remaining portion of the first letter of credit as well as the other five unused letters of credit. No documents were ever presented under these remaining letters of credit to SCB.[2]

In the third transaction, the transaction in which plaintiff Thiagarajar was involved, Peregrine contracted to sell the cotton lint that was rejected by Kohinoor to plaintiff and Loyal, two Indian cotton mills. Thornton, under the alias John Oparah, posed as Peregrine's principal and commu-

---

2.  SCB maintains that although Kohinoor canceled the letters of credit, it was required to keep funds totaling over $10 million available for possible payment because it had confirmed the other five unused letters of credit.

SCB argues that it incurred $116,031.40 in costs but has not been able to collect the fees for those letters of credit. (Castadot Decl. ¶ 39).

nicated with Saroj Trading about the sale of high quality cotton. (Pl.Resp., Ex. 7). Thornton, as Oparah, sent a high quality sample of raw cotton to Saroj, representing it as the cotton he sold. After receiving the sample, Saroj advised Thiagarajar to contact Oparah about purchasing the cotton. (*Id.*). During the negotiation of the purchase of the cotton, Thiagarajar first requested, via fax, that it be able to pay for the cotton on 90–day terms, stating that it did "not want to pay for the cotton upfront and wait for its arrival." (Def.Mot., Ex. A). Oparah (a.k.a.Thornton) of Peregrine responded by fax and insisted on payment on a "cash against documents" basis.[3] (*Id.*, Ex. B). On September 15, 1995, Thiagarajar faxed a contract to Peregrine providing for payment of ninety percent of the purchase price "on a CAD [cash against documents] basis and the balance 10% after weighment and passing at the mills." (*Id.*, Ex. C). The cash against documents portion of the contract required payment of $319,368.74 from Thiagarajar and $323,132.35 from Loyal. (Castadot Decl. ¶ 54). The parties structured the transaction using a documentary collection procedure rather than letters of credit.[4]

In these documentary collections, SCB acted as a "remitting" bank or "collecting" bank.[5] As a remitting or collecting bank, SCB was obligated to receive documents from the seller (Peregrine), forward such documents to the buyers' (Thiagarajar and Loyal) banks on a collection basis, receive payment for the documents from the buyers' banks if and when the buyers accepted and paid for the documents, and in turn pay the seller upon receipt of such funds. (*Id.* ¶ 53).

On September 29, 1995, SCB received from Peregrine the documents for collection, which included a bill of lading, a commercial invoice, and a sight draft in connection with one shipment to Thiagarajar and one to Loyal. That same day, SCB forwarded the original documents, on a collection basis to Indian Overseas Bank, of Madurai, India (for Thiagarajar) and to State Bank of India, of Madras, India (for Loyal). (*Id.* ¶ 55; Ex. 24, 25). The collection document expressly provided that it was subject to the Uniform Rules for Collections, the URC. (Castadot Decl., Ex. 26). On October 5, 1995, Thiagarajar received from its bank, Indian Overseas, the documents which Indian Overseas had received from SCB. Thiagarajar paid its bank in exchange for the documents and Indian Overseas then remitted the $319,368.74 to SCB, by wire transfer. SCB then remitted the funds to a Peregrine account at Barclays Bank in Tortola, British Virgin Islands, as instructed by Peregrine. For its involvement in this document collection, SCB received seventy (70) dollars. (*Id.* ¶ 57; Naraine Dep., cumulative Ex. 11).

After SCB had paid Peregrine, on October 9, 10, and 11, 1995, SCB received faxes from Indian Overseas Bank informing SCB that the payment on behalf of Thiagarajar "was not in order," and asking SCB not to pay Peregrine "as documents have been rejected by the drawee [Thiagarajar]" and to return the payment to Indian Overseas Bank. (Castadot Decl., Ex. 27, 28). In response to the faxes, SCB sent a telex to Indian Overseas Bank informing it that as payment had left SCB

---

**3.** In a cash against documents transaction, the buyer pays for the goods when its bank receives the required documentation instead of paying for the goods upon arrival. *See* Clark, *supra,* at 13.10[2] at 13–37.

**4.** For a general discussion of documentary collections and letters of credit, see J. White & R. Summers, *Uniform Commercial Code,* Ch. 20 and 26 (4th ed.1995).

**5.** The N.Y.U.C.C. defines a "collecting" bank broadly to include any bank handling collection except a "payor" bank. N.Y.U.C.C. § 4–105(d). Under the Uniform Rules for Collections (the "URC"), 1987 revision, ICC publication 322, a "remitting" bank is defined as "the bank to which the principal [Peregrine] has entrusted the operation of the collection." (Ex. 26, URC Def. at p. 9).

on October 5, 1995, SCB was unable to recover or return payment. (*Id.*, Ex. 29). With respect to the Loyal collection, as in plaintiff's case, SCB forwarded the original documents to Loyal's bank, State Bank of India. Unlike plaintiff, however, State Bank of India sent a telex to SCB, dated October 13, 1995, stating that it was returning the documents without payment at the request of the drawee, Loyal, due to discrepancies found in the documents. After these transactions, SCB had no further contact with Thornton or his companies except to request payment for services in connection with the five unused Kohinoor letters of credit. (*Id.* ¶ 64; Ex. 30–32).

Summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." *Kochins v. Linden–Alimak, Inc.,* 799 F.2d 1128, 1133 (6th Cir.1986).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing the motion must "do more than simply show that there is some meta-physical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In short, the nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." *Cloverdale Equip. v. Simon Aerials, Inc.,* 869 F.2d 934, 937 (6th Cir.1989).

Plaintiff alleges four causes of action against SCB: common law fraud (Count I), civil RICO (Count III), Tennessee Consumer Protection Act, T.C.A. § 47–18–101 *et seq.* (Count IV), and conspiracy/aiding and abetting to defraud (Count V). Plaintiff argues that SCB is liable under these causes of action because SCB knew or should have known that Thornton and his companies were fraudulently selling and shipping worthless "raw cotton lint" instead of "raw cotton," and that SCB had a duty to disclose this fraudulent conduct. Plaintiff also argues that the documentary collections in which SCB assisted are governed by the N.Y.U.C.C. which imposes a duty of good faith and ordinary care. Plaintiff contends that SCB violated this duty when it: (1) carried out the documentary transaction knowing that Thornton did not have authority to act on behalf of Peregrine; (2) failed to disclose Thornton's lack of authority on behalf of Peregrine to it and its bank, Indian Overseas Bank.[6]

The court first turns to plaintiff's argument that SCB is liable because SCB knew or should have known that Thornton and his companies were defrauding plaintiff and had a duty to disclose the fraud. Plaintiff argues that as a result of SCB's involvement in the Thai and Kohinoor transactions, SCB knew or should have known about Thornton's fraudulent prac-

---

6. In its response, plaintiff appears to argue a cause of action for negligence and breach of warranty against SCB. Plaintiff, however, did not allege negligence or breach of warranty in its complaint. Thus, any evidence of a breach of duty or warranty goes only to the causes of action alleged in the complaint.

tices. The court finds that plaintiff's argument is without merit. Plaintiff has offered no evidence that SCB knew or should have known about Thornton's fraud in connection with the Thai and Kohinoor transactions.

Plaintiff does not dispute that these transactions involved letters of credit which were governed by the UCP.[7] A fundamental principle under the UCP is that the bank's role and liability is completely independent from the underlying purchase and sale agreement. Article 3 provides: "Credits, by their nature, are separate from the sales or other contract(s) on which they may be based and banks are in no way concerned with or bound by such contracts, even if any reference whatsoever to such contract(s) is included in the Credit." UCP, 1993 Revision, ICC Publication No. 500, B, p.1. Article 4 of the UCP provides: "In Credit operations all parties concerned deal with documents, and not with goods, services and/or performances to which the documents relate." *Id. See also KMW · Int'l v. Chase Manhattan Bank,* 606 F.2d 10, 15 (2d Cir.1979); Clark, *supra,* at 14.02[1].

Plaintiff does not allege that SCB did not comply with the UCP in carrying out its responsibilities under the letters of credit. Rather, plaintiff argues that SCB knew or should have known of the alleged fraud in connection with the earlier letters of credit transactions because SCB had been provided with a copy of an invoice from Peregrine's supplier of the cotton lint, TMI IMO, which described the goods as "raw cotton lint." Although the invoice may have referred to the goods as "raw cotton lint," Muriel Castadot, the SCB officer principally responsible for communicating with Thornton and Peregrine, testified

that she did not know that the "raw cotton lint" referred to in the invoice was different from the "raw cotton" described in the letter of credit. (Castadot Decl. ¶ 13–17). Moreover, the court finds that Castadot did not have an obligation to know the difference between these trade terms. *See Marino Indus. Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112, 115 (2d Cir. 1982) ("The bank is not expected or required to be familiar with or to consider the customs of, or the special meaning or effect given to particular terms in, the trade.").

Further, under Article 13 of the UCP, SCB was under no obligation to even examine the invoice because it was not one of the required documents specified in the letters of credit. Article 13 provides: "Banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit ... Documents not stipulated in the Credit will not be examined by banks. If they receive such documents, they shall return them to the presenter or pass them on without responsibility." 1993 Revision, ICC Pub. No. 500, C, P.2d. Finally, Article 15 of the UCP provides that banks are not liable or responsible for the "form, sufficiency, accuracy, genuineness, falsification or legal effect of any documents" or the "quality," "value or existence of the goods represented by any document(s)." *Id. See Auto Servicio v. Compania Anonima Venezolana,* 765 F.2d 1306, 1310–11 (5th Cir.1985), quoting *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230, 235 (5th Cir.1983) ("[T]he peculiar values of the letter of credit are (1) that they provide the assurance of payment, (2) that they can provide

---

**7.** The parties do not dispute that New York substantive law applies to the transactions at issue. SCB's alleged misconduct occurred in SCB's New York office, and New York has a significant interest in regulating banking practices occurring within its borders. *See Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 121 (2d. Cir.1984).

Article 5 of the N.Y.U.C.C. is concerned with letters of credit. However, the UCP controls, in lieu of Article 5, when by its terms the letter of credit is made subject to the UCP, as it is here. N.Y.U.C.C. § 5–102(4). The court notes, however, that the result would be the same under Article 5 of the N.Y.U.C.C. and the UCP.

that assurance in respect to any transaction, and (3) that they are inexpensive. These values will be lost if performance of the letter of credit is to be infected by the nonperformance of the underlying transaction ...."). Thus, the court finds that SCB is not liable on any of plaintiff's claims based on SCB's alleged knowledge of fraud perpetrated by Thornton and his companies.[8]

Plaintiff next argues that SCB violated its duty of care in undertaking the documentary transaction with respect to Thiagarajar when it: (1) carried out the documentary transaction knowing that Thornton did not have authority to act on behalf of Peregrine; and (2) failed to disclose Thornton's lack of authority on behalf of Peregrine to it and its bank, Indian Overseas Bank. The court initially notes that the parties dispute whether the N.Y.U.C.C. or the Uniform Rules for Collections (the "URC") governs the documentary collection. The collection letter which SCB sent to Indian Overseas Bank expressly stated that it was subject to the URC. (Castadot Decl., Ex. 25). In response, plaintiff submitted an affidavit from Indian Overseas Bank which states that it did not agree with SCB that the URC would govern the collection. (Resp., Ex. 4, ¶ 5). The court need not reach the issue of which set of rules govern because, for purposes of the instant case, the standard of care is the same under both the URC and the N.Y.U.C.C. Plaintiff argues that SCB breached its duty of good faith and ordinary care under N.Y.U.C.C. §§ 4–202(1) and 4–103(1). These provisions are essentially identical to Article 1 of the URC, which states that "Banks will act in good faith and exercise reasonable care."

(Ex. 26, p.9, Art. 1). Thus, the court must determine whether SCB acted in good faith and used ordinary care with respect to plaintiff's documentary collection.

Acting as either a "remitting" bank under the URC or a "collecting" bank under the N.Y.U.C.C., it is clear that SCB did not breach any duty arguably owed to plaintiff. Under the URC, SCB was obligated to verify that the documents it received from Peregrine appeared to be as listed in the collection order; to notify Peregrine of any documents missing; and to forward the documents to the appropriate "collecting" bank, Indian Overseas.[9] SCB's duties under the N.Y.U.C.C. were essentially identical. *See* N.Y.U.C.C. §§ 4–104(f), 4–501.

Plaintiff does not argue that SCB failed to carry out these straightforward tasks in good faith and with ordinary care. Rather, plaintiff asks that the court extend the duties of a collecting bank under the N.Y.U.C.C. to include a duty of inquiry. To support its position, plaintiff relies on a single case from a lower New York state court, *Broadway Nat'l Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 585 N.Y.S.2d 933 (N.Y.Sup.1992), which it concedes only "arguably extends" the duty of care to a duty of inquiry. Further, plaintiff admits that "counsel has been unable to locate case law specifically under § 4–202 which imposes the duty of inquiry directly on collecting banks." (Pl. Resp. at 20). Moreover, the court notes that *Broadway Nat'l Bank* is factually distinguishable from the instant case as it deals with credit cards. Thus, the court declines to extend a collecting bank's duty of care to require it to inquire beyond the face of the documents.[10]

---

**8.** In its response, plaintiff also referred to financial difficulties of T & C, and complaints and arbitral awards that the Thai mills and Kohinoor had obtained against Thornton. (Pl. Resp. at 7). There is no evidence, however, that SCB knew or should have known about any of these situations.

**9.** Article 2 of the URC states that "Banks must verify that the documents received ap-

pear to be as listed in the collection order .... Banks have no further obligation to examine the documents." (Castadot Decl., Ex. 26, URC at p. 9).

**10.** In its response to SCB's motion, plaintiff argues that summary judgment should be denied because SCB's witness, Drupatie Naraine, when deposed could not remember the names of Peregrine, Thornton, and did not

Plaintiff next argues that SCB breached its duty when SCB did not notify it or Indian Overseas Bank that SCB's power of attorney from Peregrine was limited to authorizing Thornton to act on Peregrine's behalf only with respect to letters of credit. Plaintiff argues that because its transaction with Peregrine was a documentary collection, it was improper for SCB to take instructions from Thornton in connection with the documentary collection. Plaintiff argues that had SCB notified Indian Overseas Bank of the limited scope of its power of attorney, "the whole fraud of Thornton would have come to light and a colossal financial loss to Thiagarajar would have been avoided." (Pl. Resp. at 14).[11]

Plaintiff's claim fails for the simple reason that plaintiff has not provided any evidence establishing that SCB took instructions from, or even dealt with, Thornton in connection with plaintiff's documentary transaction. None of the documents in the collection mention Thornton. Instead, they demonstrate that SCB dealt only with Peregrine. In the collection, SCB confirmed its receipt to Peregrine, forwarded documents on behalf of Peregrine, and transferred funds to Peregrine's account at Barclay's Bank in the BVI. (Naraine Dep. at 34–35; Ex. 11 at S000433, 434, 440, 451–53). Thus, the court finds that SCB did not breach any duty owed to plaintiff based on Thornton's limited authority to transact business for Peregrine.

Plaintiff also argues that SCB breached the N.Y.U.C.C. § 4–207, the warranty provision covering collections, because it had an obligation to guarantee that all signatures were genuine or authorized. Because the name used on Peregrine documents, John Oparah, was not genuine, plaintiff argues that SCB is liable. This argument fails for several reasons. First, § 4–207 does not apply to documentary collections, i.e., checks or drafts accompanied by other documents, which is the case here. Documentary drafts, which are defined in § 4–104(f), are subject to the provisions of N.Y.U.C.C. §§ 4–501 to 4–504, not § 4–207. See Merchants Bank of N.Y. v. Credit Suisse Bank, 585 F.Supp. 304, 308 n. 7 (S.D.N.Y.1984) ("Part 2 [of UCC Article 4] deals with obligations in general of collecting banks and Part 5 deals with the collection of documentary drafts."), citing Continental Time Corp. v. Merchants Bank of N.Y., 117 Misc.2d 907, 459 N.Y.S.2d 396, 397 (N.Y.Sup.1983); Gathercrest Ltd. v. First American Bank & Trust, 649 F.Supp. 106, 117 (M.D.Fla. 1985) (applying Florida's U.C.C. §§ 4–501 to 4–504 to the collection of documentary drafts). Plaintiff has not cited a single case in which the N.Y.U.C.C. warranty provision was applied to a documentary draft collection. Moreover, even if § 4–207 did apply to the present transaction,

remember the collection involving Thiagarajar and Peregrine. Plaintiff argues that this demonstrates that "SCB is attempting to hide their prior knowledge of Thornton's wrongdoings." (Pl. Resp. at 15). Plaintiff's argument is meritless. Plaintiff's counsel asked Naraine questions without first showing her any documents. Later in the deposition, when SCB's counsel showed her documents with her signature, Naraine was able to read and interpret her notations and provide a description of the transactions. (Pl. Resp., Ex. 2. at pp. 34–64). It is incredible to suggest that Naraine, a collections specialist, who processes over one thousand collections per year, should recall from memory alone a collection that took place more than three years before her deposition. (Naraine Decl. ¶¶ 5–8).

11. The court first notes that this conclusion is far from certain given that the purpose for which SCB sought a power of attorney was to protect SCB against any possible claim from the beneficiary, Peregrine, that SCB had paid the wrong party. If SCB was concerned about the power of attorney, SCB would have likely addressed its concerns first with Peregrine. Since Peregrine was actually controlled and operated by Thornton, in the event that Thornton was not authorized to act on Peregrine's behalf, Peregrine would most certainly have corrected the problem and it would never have been brought to plaintiff's attention. In any case, plaintiff's argument fails for a different reason.

under New York law, consistent with the majority view, plaintiff, as a drawer, may not assert a warranty claim against the collecting bank. *See Gr. Lakes Higher Educ. v. Austin Bank*, 837 F.Supp. 892, 897 (N.D.Ill.1993); *Horovitz v. Roadworks of Great Neck, Inc.*, 76 N.Y.2d 975, 563 N.Y.S.2d 735, 565 N.E.2d 484 (1990).

Finally, plaintiff argues that SCB conspired, or aided and abetted Thornton, to commit common law fraud, and violate civil RICO based on SCB's alleged violations discussed earlier. Plaintiff, while devoting several pages to discussing the applicable law, provides no basis for these claims. As discussed earlier, there is no evidence that SCB even made a representation to plaintiff or that SCB knew or should have known of any fraud perpetrated by Thornton and his two companies, T & C and Peregrine. Nor is there any evidence linking Thornton's fraud to SCB action or demonstrating that SCB entered into an agreement with Thornton with respect to any fraudulent conduct. Moreover, plaintiff failed to provide evidence that SCB violated a duty to disclose information or perform other duties under the N.Y.U.C.C. or the URC.

Accordingly, the court GRANTS defendant Standard Chartered Bank's motion for summary judgment.

IT IS SO ORDERED.