OPINION OF THE COURT
Diane A. Lebedeff, J.
In a case centering upon fraudulent credit card charge slips, two banks involved in the processing of the slips raise significant issues regarding their respective rights and responsibili *183 ties. Defendant Chemical Bank (Chemical) moves for dismissal of the three causes of action asserting breach of contract, negligence, and breach of fiduciary duty, urging that these claims fail to state a cause of action (CPLR 3211 [a] [7]).
The fraud is best coined an "illusory authorization hoax.” Defendant Barton-Russell Corporation (Barton) had a merchant credit card account. Barton omitted preauthorization numbers or assigned improper preauthorization numbers on credit card charge slips for the purported purchase of merchandise or services, creating the illusion that the charges had been duly preauthorized. The slips were deposited into a merchant account at Broadway National Bank (Broadway National), and the account was credited with cash the next day. As it develops, an illusory authorization number does not come to the active attention of processing banks until the charge to the customer’s account is rejected and the slip is returned to the network member bank initiating the processing. If, as here, the credit card belongs to a principal of the merchant and the amount charged is over the credit limit of the "customer’s” account, the "customer’s” bank returns the item automatically, with no need for the principal to surface with particularized objections. As the charge is being processed, which takes a goodly period of time, more charge slips can be generated, converted to cash, and cash withdrawn. The cycle can continue until, as here, the merchant’s bank is called upon to make good the unpaid charges, and, after realizing a fraud is afoot, sets up an hue and cry. The gross amount involved here was in excess of $180,000 over the course of more than six months of charges.
FACTS
Barton was a customer of plaintiff Broadway National. Under a January 1987 agreement with Broadway National, Chemical processed Mastercard charges of Broadway National’s merchant customers, such as Barton. Barton transmitted the slips to Broadway National and received a credit in a Broadway National account for the face amount of the slips, less a discount, with the net amount available as cash after one business day, subject to charge-backs. The form for merchant contracts was given to Broadway National by Chemical.
Under Chemical’s procedures, Barton deposited the slips to Broadway National in a sealed envelope with a total amount listed on the front. The envelope was transmitted still sealed *184 to Chemical. Chemical credited a Broadway National settlement account for the total amount of the slips, less a discount, and forwarded the slips for processing through the Mastercard network. Plaintiff urges the Chemical procedures prevented it from detecting fraud by precluding its examination of the slips for verification or for signs of fraud. Among recognized "red flags” of credit card fraud, all present here, are a large number of charges on a single credit card, numerous handwritten slips, and improperly completed slips.
Ultimately, about six months after each transaction, Broadway National was notified that the charges had not been honored and Broadway National was backcharged the amount involved. Although there had been earlier charge-backs, in a final series of charge-backs, Chemical debited Broadway National’s settlement account approximately $180,000, which, after charge-backs to the Barton account, left Broadway National with a loss of $147,944.87. Plaintiff contends it could have reduced the loss had Chemical notified it earlier of the rejection of the items. Defendant Brian D. Covington is currently serving a prison sentence in connection with the fraud.
Chemical’s own processing of credit card slips is described in two depositions of Chemical employees, which did not address Barton’s specific transactions. Generally, Chemical’s microfilming of the slips and electronic transmittal of relevant data to Mastercharge consumed approximately 12 to 18 hours, although the period could be as long as three days during the holidays. Chemical’s processing ignored the presence or absence of a preauthorization number, for the number was irrelevant unless the credit card customer complained to the payor bank. Mastercard sorted the information for transmittal to customers’ banks.
If Chemical received an inquiry or refusal to pay, it would "research the item” and if "the reason for the chargeback * * * wasn’t legitimate, it would send the item back through interchange” (Calaban deposition, at 50). The time limit to send a copy of a slip to the cardholder’s bank was 30 days. If the slip had an authorization number, Chemical would send a copy of the log to the cardholder’s bank but, if there was no authorization number, no further information would be tendered to the rejecting bank. The most extended processing occurred if a charge goes "back and forth four times * * * each time an average of 45 days,” which can run a "full 180 days” (Spillman deposition, at 30).
*185 Plaintiff urges a suspect eye should be cast upon the claim that these slips were properly being cycled through the system for such an extended period of time, which purportedly led to spring 1988 charges being rejected in late fall of the same year. Broadway National observes that more than $180,000 of the total fraudulent charge slips were rejected for missing or improper authorization numbers. Under the procedures outlined at the depositions, it is a fair conclusion that slips presenting such a problem should have been identified in perhaps 75 days, consisting of the 45 days to receive an advice from the cardholder’s bank and the 30 days to find the slip and check the log of preauthorization codes maintained in Chemical’s processing center located in Jericho, New York. Chemical does not suggest in what manner, with a lack of a proper preauthorization number, repeated presentation could correct the deficiency.
Broadway National notes Chemical was in the process of discontinuing this line of business and selling it to National Data Corporation. The sale took place in August of 1988, with the transfer of the business taking place in October or November of 1988. It may be inferred that these facts are presented to suggest Chemical had reason to maximize the volume of its credit card business during its sale efforts and then to benefit its cash position by charge-backs in the time between the contract and the divestment of the business. This observation is consistent with plaintiff’s September 27, 1988, protest that "our research indicates that these items were [backcharged] by the cardholder banks several months ago and delayed by you.” Broadway National also urges Chemical’s submissions on its own merchants were returned to Chemical within 45 days, allowing Chemical to proceed quickly to recoup whatever it could from the merchants in question, while Broadway National was not notified until much later.
As to actual fraud detection procedures Chemical extended to Broadway National, Chemical performed an INET check, which is consultation with a list of fraudulent merchants maintained by Mastercard, and a check against Chemical’s own list of fraudulent merchants, both done before the merchant is "put on the system”. As to individual items, Chemical’s fraud prevention program included a "floor limit,” an amount over which authorization was necessary, but did not include any special treatment for handwritten slips. Chemical had no system for flagging problem items until the cardholder’s bank noticed a problem.
*186 Finally, because the record does not explain preauthorization numbers, the court will adopt as a working model the observations in Worthen Bank & Trust Co. v National BankAmericard (485 F2d 119 [8th Cir 1973], cert denied 415 US 918 [1974]), a Sherman Act case, which explained: "[T]o insure the integrity of the system, there must be a process whereby the validity of the card and the availability of credit may be established prior to a purchase.” (Supra, 485 F2d, at 121.) The record in that case contained documents from Mastercard, the same card system involved here, explaining how, as of 1973, Mastercard was developing a linkage so that "computers in one city can interface with each other and directly authorize cardholder transactions” (supra, at 122).
NEW YORK LAW REGARDING CREDIT CARDS
There is, indeed, little New York law in this area. The bulk of New York cases address billing errors respecting a cardholder’s rights under the Consumer Credit Protection Act appearing at 15 USC § 1601 et seq., and the Truth in Lending Regulations, Regulation Z (see, Plutchok v European Am. Bank, 143 Misc 2d 149 [Dist Ct, Nassau County 1989]; National Commercial Bank & Trust Co. v Malik, 72 Misc 2d 865 [Sup Ct, Albany County 1973]), which apply to individual credit card customer transactions under open-ended credit plans, commonly known as credit card or charge card accounts (Jacobs v Marine Midland Bank, 124 Misc 2d 162 [Sup Ct, Orange County 1984]). Possibly because a consumer may only be charged $50 on any item properly protested, few cases have addressed the nature of the credit card obligation (see, Chase Manhattan Bank v Hobbs, 94 Misc 2d 780 [Civ Ct, Kings County 1978] [explaining the lack of damages]).
Even merchant accounts have received little examination as to their character, having been considered primarily in relation to cancellation for failure to follow proper procedures (Albany Sav. Bank v All Advantages Limousine Serv., 154 AD2d 759 [3d Dept 1989]), accessibility for discovery purposes (UBAF Arab Am. Bank v Sanchez, 169 AD2d 623 [1st Dept 1991]), and a need to seasonably settle a merchant’s account (Schorr v Bank of N. Y., 91 AD2d 125 [2d Dept 1983]). Because of the surprising paucity of New York case law on more generalized banking issues relevant to credit cards, these issues must be considered in a broader context.
*187 THE INTER-BANK RELATIONSHIP
Analysis must commence with examination of the relationship between Chemical and Broadway National, because the relationship will in turn define the applicable duties. One leading authority describes the credit card network relationship of a larger servicing bank and smaller customer bank as a joint venture (Baker and Brandel, Electronic Fund Transfer Systems ¶ 23.08 [2d ed]; see also, ¶ 1.02 [3]; ch 23). There is apparently intense competition between networks to secure subscribers (id., ¶ 25.05).
Although there are few cases on point, upon analysis and research, it must be concluded that the law governing this banking relationship is found in the Uniform Commercial Code, specifically in article 4, entitled Bank Deposits and Collections. Charge slips are "commercial paper” and the network processing is called "interchange” (Baker and Brandel, op. cit, at 1-12). UCC article 3 does not apply because a "credit card is a commercial instrument, but * * * not a negotiable instrument” (Vergari and Shue, Checks, Payments and Electronic Banking, at 18 [1986]; accord, Lincoln First Bank v Carlson, 103 Misc 2d 467 [Sup Ct, Chautauqua County 1980] [credit card charge accounts slips not negotiable instruments under UCC 3-104]).
Rather, credit card slips are "items” within the meaning of UCC 4-104 (1) (g) and 4-402 (see, In re Twenty-Four Hour Nautilus Swim & Fitness Center, 81 Bankr 71 [US Dist Ct, Colo 1987] [relationship of customer to merchant]). Indeed, in this plaintiff’s suit upon its financial institution bond for these same losses, it was so determined. In Broadway Natl. Bank v Progressive Cas. Ins. Co. (775 F Supp 123, 128 [SD NY 1991]), the court stated: "Moreover, Article 4 of the Uniform Commercial Code, which governs Bank Deposits and Collections, suggests that 'items,’ as used in the banking industry generally, is a broad enough term to encompass credit card sales slips. The U.C.C. defines 'items’ to include 'any instrument for the payment of money even though it is not negotiable but does not include money.’ [UCC 4-104 (1) (g).] On its face, such a definition would include credit card slips. A recent decision from another jurisdiction, construing an identical provision, held that credit card slips are 'items’ within the cited U.C.C. provision. See First United Bank v. Philmont Corp., 533 So.2d 449 (Miss.1988).” (Emphasis omitted.) Given that a credit card slip falls within article 4, the court may turn to a definition of the banking relationship.
*188 In First United Bank v Philmont Corp. (533 So 2d 449 [Miss 1988]), cited in the above quotation, the court examined the relationship of a charge account merchant to the merchant’s bank and held:
"As these sales slips are items within the meaning of Article 4, then the [merchant’s] bank is a 'depositary bank’ and 'collecting bank’ for the purpose of further Code analysis. [UCC 4-105 (a)] * * * 'Depositary Bank means the first bank to which an item is transferred for collection’ [and, under UCC 4-105 (d)] * * * 'Collecting Bank means any bank handling the item for collection’ * * *
"The First United Bank was acting as a depositary bank in all of its dealings with [the merchant], provisionally crediting [the merchant’s] account upon the deposit of the credit card sales slips. Trustmark [the bank which was the network 'member bank’] was functioning as a clearinghouse for these items, forwarding the slips to other member banks for ultimate collection.” (533 So 2d, at 453-454.)
The court adopts the foregoing analysis of the bank relationships, but finds only that Chemical was acting as a collecting bank. Based upon the record here, it appears that Chemical did not function as a clearinghouse.
From this point forward, there are almost no cases on point as to credit cards. Nonetheless, it follows that other provisions of article 4 are applicable. Such principles indicate a merchant remains the "owner” of an item and is ultimately responsible to bear any loss (see, In re United Sciences, 84 Bankr 79, 82 [ND Tex 1988], citing Allen v Carver Fed. Sav. & Loan Assn., 123 Misc 2d 704 [App Term 1984]). A bank into which the item is deposited: has a security interest in each item, in the words of UCC 4-208 (1) (b), "to the extent of the credit given whether or not the credit is drawn upon and whether or not there is a right of charge-back;” is not required to file a security statement (In re Standard Fin. Mgt. Corp., 94 Bankr 231, 234-235 [D Mass 1988] [involving credit cards]); and is considered a holder in due course to the extent of its security interest (UCC 4-209). The depositary bank may charge back the account for an unpaid item (UCC 4-212) until final settlement (UCC 4-213).
Article 4 also defines the duty of care. A collecting bank "must use ordinary care” in exercising its basic collection tasks (UCC 4-202 [1]). A "collecting bank” is required to act seasonably and it has the burden of proof to establish season *189 ableness. Southern Cotton Oil Co. v Merchants Natl. Bank (670 F2d 548, 550 [5th Cir 1982]) stated the applicable principles as follows: "The U.C.C. requires a 'collecting bank’ to exercise ordinary care in the presentment and notice of dishonor of an item * * * and the bank has the burden of establishing seasonable action beyond the midnight deadline. U.C.C. §4-202. 'Reasonable’ or 'seasonable’ time for taking any action depends upon the nature, purpose and circumstances of such action. U.C.C. § 1-204(2). A course of dealing may establish the seasonableness of an action. U.C.C. § 1-205; § 3-503.” These observations are found to apply here. Chemical is not a payor bank, defined under UCC 4-105 (b) as a bank by which an item is payable as drawn or accepted, for the charge accounts of the merchant’s "customer” were not Chemical charge accounts.
The article 4 obligations of collecting banks may be modified by agreements, such as the Broadway National-Chemical agreement. The ability of banks to regulate their relationship by agreement is well respected for, as the New York Court of Appeals has observed, "the code’s requirements can be modified by agreement to conform them with commercial usage, in or out of banking circles, so that parties may advantage themselves of the 'wisdom born of accumulated experience’ ” (David Graubart, Inc. v Bank Leumi Trust Co., 48 NY2d 554, 560 [1979], quoting Bankers Trust Co. v Dowler & Co., 47 NY2d 128, 134 [1979]).
However, such an agreement may not eliminate the Code’s duty of reasonable care, for UCC 4-103 (1) limits the effect of a disclaimer with the following language: "(1) * * * no agreement can disclaim a bank’s responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.” Any portion of an agreement which waives a duty to exercise ordinary care is unenforceable (see, e.g., Manufacturers Hanover Trust Co. v Akpan, 91 Misc 2d 622 [Civ Ct, Kings County 1977]).
Ultimately, the credit card network operating regulations, which were not presented here but were incorporated by reference in the parties’ agreement, will also be relevant to a definition of duties. Credit card network operating regulations have been viewed as the equivalent to clearinghouse rules and are permitted to vary the provisions of article 4 to the extent *190 not manifestly unreasonable (see, First United Bank v Philmont Corp., supra, 533 So 2d, at 454-455). Given that Broadway National does not urge application of UCC 4-213 (4) (b) and its three-day charge-back rule, it is assumed that the regulations grant a longer period of time for processing. Clearinghouse rules must still fall within article 4 confines for, as Comment 3 to UCC 4-103 indicates, "[t]here is, of course, no intention of authorizing a * * * clearing house * * * to rewrite the basic law generally.”
Accordingly, even agreements between banks and network regulations do not obviate the requirement of UCC 4-202 to use "ordinary care.” Although plaintiff can point to no specific defined duty contained in the UCC which is specifically applicable here, the inquiry does not end with this observation.
This case does not present the first time a court has been called upon to consider duties arising out of novel facts and transactions unknown at the time the UCC was drafted. A comparable situation was presented in Northpark Natl. Bank v Bankers Trust Co. (572 F Supp 524 [SD NY 1983]), in which a depositary bank sued a collecting bank in relation to an incident involving fraudulent encoding on a check, a type of fraud now known as "MICE” (Magnetic Ink Character Recognition) fraud.
In that case, Judge Whitman Knapp provided a scholarly and comprehensive analysis of the relevant portions of the UCC and ultimately held that a claim could be stated against a collecting bank for failure to advise of the possibility of "notice of dishonor or non-payment” mentioned in UCC 4-202 (1) (b) even though the defendant was not a payor bank (supra, at 533). The finding was premised upon the UCC’s basic approach that a collecting bank may be held accountable in negligence for its own improper actions (UCC 4-202, Comment 4). After observing that, "in the context of those provisions which impose a duty of care, the Code’s watchword is 'flexibility’ ” (572 F Supp, supra, at 533), the decision continued:
"First, there [is] no mechanical test for what constitutes ordinary care in a novel situation, the ultimate standard is dictated by the imperatives of sound banking practice, seasoned by the obligation of good faith. See UCC § 1-201(19). Second, flexibility is a two way street: just as a new task or procedure will certainly be acceptable if it reflects sound *191 banking practice, so the lack of one — when such absence violates sound banking practice — should be actionable.
“Concerning UCC §4-202 in particular, there are strong indications that the tasks described in UCC § 4-202(l)(a) through (e) are not an exhaustive list of the actions to be taken by a collecting bank in order to satisfy its obligation of ordinary care. See UCC § 4-202 * * * comment 4 ('ordinary care’ is used in its 'normal tort meaning’ and '[n]o attempt is made * * * to define in toto what constitutes ordinary care of [sic] lack of it’). This leads to the further conclusion that the enumeration in UCC § 4-202(l)(a) through (e) should not be deemed — by negative implication — a bar to the reinterpretation (or expansion) of the duties owed by a bank in discharging its collection function with ordinary care.” (Supra, at 534 [emphasis added].)
Accordingly, the lack of an identified specific duty is not fatal, especially because Broadway National’s contentions are consistent with the theme of article 4, which, as stated in the Comments, is "the overall requirement and objective of speedy collection” (UCC 4-108, Comment 2). Chemical may be held to have conceded this point for it fails to argue specifically that the claim is outside its obligations as presented in UCC 4-202.
Judge Knapp examined whether imposing a new obligation upon a collecting bank would impose an onerous duty: “It would be up to the depositary bank to draw its own inference in light of its experience with the customer involved. Moreover, the requirement of notification would place no undue burden on the collecting bank. All that would be required would be routine instructions that such disparity be automatically referred to a given individual whose automatic duty it would be to notify the depositary bank.” (Northpark Natl. Bank v Bankers Trust Co., 572 F Supp, at 535, n 25, supra [emphasis added].) On this point, this court also observes that the duty of care urged by plaintiff would place no unusual burden upon a collecting bank. Indeed, any affirmative act would be of no greater dimension than that addressed by Judge Knapp, and, in the type of instance involved here, especially as relevant to handwritten slips and missing preauthorization numbers, affirmative action might well be avoided altogether if the collecting bank were allowed to inspect the item itself, consistent with the UCC’s inherent assumption that examination of the face of the item will be by the depositary bank (UCC 4-201, Comment 6).
*192 Chemical here urges the depositary bank should be held responsible for its own failure to know its customer. That contention was also raised before Judge Knapp, who roundly rejected the suggestion with the following observation: "If there is a policy implicit in the UCC’s rules for the allocation of losses due to fraud, it surely is that the loss be placed on the party in the best position to prevent it. See B. Clarke, The Law of Bank Deposits, Collections & Credit Cards, ]j 6.1 (1981). At oral argument we suggested that plaintiff should be made to bear — on policy grounds — full responsibility for this loss. It is, after all, a bank’s business to make certain that it doesn’t deal with crooks. On further reflection, however, we are not prepared to say that no share of the loss should be placed — on policy grounds — on a collecting bank which might be shown to have known (or to be on notice) that fraud was afoot and did nothing to stop it, although it had the 'last clear chance’ to do so. However, on the record before us no facts are pleaded * * * [as to whether] the face of the item * * * should alert any knowledgeable banker to the probability of fraud.” (Northpark Natl. Bank v Bankers Trust Co., 572 F Supp, at 535, supra [emphasis added].) This consideration plays some role here, especially because Chemical appears to concede slips with no authorization number or in handwriting would serve as a "red flag” to a "knowledgeable banker.”
Further, given that this case involves extended processing delays, any duty to advise must be considered in that time frame rather than in the typical processing duration for a single item of one or two days. This aspect of the facts is emphasized repeatedly by Broadway National, which argues it is impossible that Chemical, if using ordinary care and acting seasonably, could take up to six months to advise it that items would not clear. Placing this leisurely pace side by side with the preauthorization process, which provides almost instantaneous information regarding the existence of an account and available credit not even at a bank but at a merchant’s place of business, the court cannot, out of hand, reject plaintiff’s basic contention as not raising proper questions under the UCC, especially without a full record before the court, as might be presented on summary judgment.
To bring the discussion to a close, this body of law, which is found to be applicable, does limit damages against a collecting bank. The liability of a collecting bank is governed by the provision of UCC 4-103 (5), which states: "(5) The measure of damages for failure to exercise ordinary care in handling an *193 item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.” This language creates a "but for” test and "plaintiffs’ measure of damages is the amount they could have collected had the Bank returned the * * * [item] seasonably, [or] conversely, if the amounts due were uncollectible in any event, the Bank’s negligence caused no damage” (Marcoux v Van Wyk, 572 F2d 651, 653 [8th Cir], cert dismissed 439 US 801 [1978]; see, for factual analysis of seasonableness, Gathercrest Ltd. v First Am. Bank & Trust, 649 F Supp 106 [MD Fla 1985]; Pandol Bros. v NCNB Natl. Bank, 450 So 2d 592 [Fla App, 4th Dist 1984]). The plaintiff has the burden of proof as to damages (Appliance Buyers Credit Corp. v Prospect Natl. Bank, 708 F2d 290, 294-295 [7th Cir 1983]).
Finally, one commentator has noted that a letter of credit analysis might play some role in the analysis of credit card cases. As well described in Merchants Bank v Credit Suisse Bank (585 F Supp 304 [SD NY 1984]), a letter of credit transaction involves three separate and independent relationships: an underlying sale of goods contract between buyer and seller; an agreement between the bank and its customer, the buyer, for whom the bank will issue a letter of credit; and the bank’s resulting engagement to pay the beneficiary, the seller, on the condition that documents to be presented to the bank conform with terms of the letter of credit. The advising bank transmits and authenticates information, and it is only responsible for accurate transmission. While a letter of credit approach might have some relevance to the purchase aspect of a credit card transaction, the court finds no analogy to the interbank relationship regarding credit card slip processing.
THE MOTION
This motion to dismiss for failure to state a cause of action challenges three causes of action. Under the applicable standard, the court must assume the truth of the allegations in the pleading and "resolve all inferences which reasonably flow therefrom in favor of the pleader” (Sanders v Winship, 57 NY2d 391, 394 [1982]), "determine simply whether the facts alleged fit within any cognizable legal theory” (Morone v Morone, 50 NY2d 481, 484 [1980]), and, generally, not consider whether there is evidentiary support for the complaint (Gug *194 genheimer v Ginzburg, 43 NY2d 268 [1977]; Holly v Pennysaver Corp., 98 AD2d 570 [2d Dept 1984]). Indeed, if plaintiff is entitled to a recovery upon any reasonable view of the stated facts, the complaint, as a pleading, is legally sufficient and a motion to dismiss for failure to state a cause of action should be denied (219 Broadway Corp. v Alexander’s, Inc., 46 NY2d 506 [1979]).
The affidavits submitted on this motion to dismiss have been "received for a limited purpose only, serving normally to remedy defects in the complaint” (Rovello v Orofino Realty Co., 40 NY2d 633, 636 [1976]). Although in early papers Chemical contended that plaintiff rejected a contract which would have placed the risk of liability on Chemical, plaintiff’s affidavits aver such an offer was not made. Accordingly, this argument presents a factual dispute which may not be reached by the court upon this motion.
BREACH OF CONTRACT
Chemical’s central contention is that the contract absolves Chemical of responsibility, for section D of the Broadway National-Chemical agreement, under which Chemical contracted to process slips generated by Broadway National merchant accounts, specifically states: "Chemical has implemented * * * procedures which are designed to detect cases of possible merchant fraud prior to the time [chargebacks] relating to the same begin to appear. If the service is made available to [Broadway National] hereunder, [Broadway National] understands that it is offered 'as is’, and Chemical makes no representations or warranty that it will detect suspected or actual instances of merchant fraud and that Chemical shall have no liability for the failure of the service to do so. [Broadway National] remains liable as provided in MCI Rules, Regulations and other directives as amended from time to time”. Chemical’s argument that the contractual provision absolutely bars all breach of contract claims of plaintiff, a depositary bank, must be rejected.
A disclaimer of warranties relating to an undefined fraud detection "service,” which service need not be provided and which service was not to be relied upon, cannot vitiate the banks’ relationship and attendant obligations. For the fundamental reasons explained above, under the UCC, a collecting bank cannot effectively disclaim a duty to use due care, the need for adherence to sound banking practice, or the obligation to take seasonable action.
*195 Although the complaint’s several references to fraud detection may be intended to refer to this "service,” the complaint, perhaps unintentionally and only by reason of happenstance of drafting, does contain broader references. This cause of action recites that "Chemical agreed to process * * * merchant transaction slips in a timely manner”, and that Chemical "failed to perform its duties and obligations” under the contract. The contract incorporates by reference "the [MCI network] By-Laws and Rules and Regulations”, to which both parties agreed to be bound and pursuant to which they agreed to perform relevant obligations. The Broadway National-Chemical agreement itself does not mention timely processing on Chemical’s part. However, Chemical does not argue the incorporated documents place no responsibility on Chemical for timely processing and the record indicates Chemical did bear such a responsibility for a bank officer represented that the interchange process does have "strict time frames”.
Given the foregoing, the court rejects the argument that Chemical could be absolved from the duty to use due care. To the extent the cause of action contains surplusage, the court ignores that language in accord with the principle that a court must "resolve all inferences which reasonably flow therefrom in favor of the pleader” (Sanders v Winship, 57 NY2d 391, 394 [1982], supra). It cannot be ignored that the gravamen of this cause of action claims violation of timely performance requirements of the contract. From the incomplete record before the court, it appears that Chemical was subject to certain time obligations under the contract. Thus, Chemical has not established that a breach of contract claim cannot lie as a matter of law.
NEGLIGENCE
The fifth cause of action, sounding in negligence, alleges that Chemical "in violation of its duty to plaintiff did carelessly, negligently and improperly examine the transactions and failed to ascertain and discover or ignored the fraudulent transactions * * * and carelessly, negligently and unskillfully failed to advise plaintiff”. Chemical urges that no tort cause of action should lie, only a breach of contract claim.
Contrary to Chemical’s contention, the breach of a duty of ordinary care is recognized as a proper basis for a negligence claim against a collecting bank by both the UCC itself (UCC 4-202, Comment 4) and by decisional law (see, Northpark *196 Natl. Bank v Bankers Trust Co., supra). Similarly, the nature of the banking relationship defeats Chemical’s argument that this negligence claim must fall because: "It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated * * * This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.” (Clark-Fitzpatrick, Inc. v Long Is. R. R. Co., 70 NY2d 382, 389 [1987].) Testing a tort claim under that standard involves a "somewhat difficult search for a distinguishing test” (Rich v New York Cent. & Hudson Riv. R. R. Co., 87 NY 382, 390 [1882]).
The inquiry must focus upon the noncontractual duty arising "as a matter of social policy” rather than upon the tortious conduct (Apple Records v Capitol Records, 137 AD2d 50, 55 [1st Dept 1988]). Cases which have attempted that search were ably explored in Charles v Onondaga Community Coll. (69 AD2d 144, 146 [4th Dept, Hancock, Jr., J.], appeal dismissed 48 NY2d 650 [1979]), in which it was observed: "A duty extraneous to the contract often exists where the contract * * * accompanies some relation between the parties out of which arises a duty of affirmative care as in cases involving bailor and bailee, public carrier and passenger, innkeeper and guest, lawyer and client, or principal and agent.” Here, Chemical was an "agent or sub-agent” of the owner of the item (UCC 4-201) and aware of the plaintiffs security interest.
Accordingly, on this motion to dismiss, this court finds the pleading is sufficient to state a tort claim. If plaintiff is ultimately to be successful, it must eventually demonstrate "(1) the existence of a duty flowing from defendant to plaintiff; (2) a breach of this duty; (3) a reasonably close causal connection between the contact and the resulting injury; and (4) actual loss, harm or damage” (Febesh v Elcejay Inn Corp., 157 AD2d 102, 104 [1st Dept 1990]). The first three requisites for a negligence action are pleaded here. Chemical does not argue that Broadway National’s damage pleading, which will eventually be factually tested under the "but for” test set forth above, is inadequate under New York State pleading requirements.
In light of the foregoing, the motion to dismiss the negligence claim, which rests upon the argument that there is no duty independent of the contract, is denied.
*197 FIDUCIARY DUTY
The sixth cause of action claims a breach of fiduciary duty. The complaint alleges plaintiff "had * * * no way of knowing * * * whether or not a pattern of fraudulent transactions [was] occurring”, that Chemical had "direct or constructive knowledge” of such patterns, and that because Chemical had "a duty to inform” which it failed to fulfill, Chemical breached its fiduciary duty to plaintiff.
Chemical urges there is no fiduciary relationship. Rather, it claims the relationship was a simple contractual one, which does not give rise to a fiduciary duty (see, Shorten v Remington Rand, 135 NYS2d 134 [Sup Ct, NY County 1954], contract to investigate accounts receivable). Chemical views the issue as one raised between a bank and a depositor, which is that of debtor and creditor, and urges case law indicates such a relationship is not of a fiduciary nature (see, Merrill Lynch, Pierce, Fenner & Smith v Chemical Bank, 57 NY2d 439 [1982]; Solicitor for Affairs of His Majesty’s Treasury v Bankers Trust Co., 304 NY 282 [1952]).
As to this argument, it must first be observed that exceptions to the debtor-creditor relationship rule exist. A bank’s fiduciary duties clearly are recognized in certain contexts, including when a bank "acts as an agent or trustee” (Olmeca, S. A. v Manufacturers Hanover Trust Co., 629 F Supp 214, 223 [SD NY 1985]), or as an escrow agent or agent holding for the benefit of another (see, Meltzer v G.B.G., Inc., 176 AD2d 687 [1st Dept 1991]; National Union Fire Ins. Co. v United States Trust Co., 163 AD2d 249 [1st Dept 1990]).
Second, Chemical is entirely in error in claiming that there was a debtor-creditor relationship. A debtor-creditor relationship arises only after collection is effected and the item is paid. While the item is in the process of collection, the collecting bank has an agency status, as specifically set forth in UCC 4-201 (see also, for fuller explanation, Comment 4).
In view of this background, the fiduciary relationship issue must be considered on its merits. A fiduciary duty generally must arise out of a relationship of confidence, trust, or superior knowledge or control (see, Chipman v Steinberg, 106 AD2d 343 [1st Dept], affd 65 NY2d 842 [1985]; Penato v George, 52 AD2d 939 [2d Dept 1976]), and may exist where one entity " 'is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation’ ” (Mandelblatt v Devon Stores, 132 AD2d 162, 168 [1st Dept *198 1987]). Pleading a breach of fiduciary duty is appropriate where a plaintiff, even if claiming a breach of contract, desires a remedy in tort for betrayal and breach of trust (Zimmer-Masiello, Inc. v Zimmer, Inc., 159 AD2d 363, 367 [1st Dept 1990]). Where a fiduciary duty may be found, this claim is generally not fatally duplicative of a breach of contract claim (Davis v Dime Sav. Bank, 158 AD2d 50 [3d Dept 1990] [bank’s obligation to pay taxes]).
Here, Broadway National was required to transmit credit card slips without examination, used a merchant agreement form prepared by Chemical giving the merchant access to funds on the next business day, and awaited upon advice regarding charge-backs, which took as long as six months. The complaint specifically recites that Broadway National reposed considerable trust in Chemical, and it takes no great stretch to characterize that confidence as "blind trust.” As a matter of law, where there is a fiduciary duty, there is a duty "to 'lay bare the truth, without ambiguity or reservation, in all its stark significance’ ” (Abrams v Shenkman, 173 AD2d 420, 422 [1st Dept 1991], quoting Wendt v Fischer, 243 NY 439, 443 [1926, Cardozo, J.], and citing TPL Assocs. v Helmsley-Spear, Inc., 146 AD2d 468 [1st Dept 1989]), and to exercise the utmost of good faith (Christian v Christian, 42 NY2d 63, 72 [1977]). The breach of those obligations is the premise of this cause of action. The court does not find this claim inapplicable to the facts at hand or improperly pleaded as a matter of law.
In closing, although not necessary to decide here, if this business combination is properly characterized as a joint venture as suggested by Baker and Brandel, Electronic Fund Transfer Systems (2d ed), a fiduciary duty could easily exist (see, Matter of Steinbeck v Gerosa, 4 NY2d 302, 317 [1958]). In such a relationship, a fiduciary duty would specifically arise in relation to any aspect of the enterprise submitted to the management of one party (see, Matter of Lester, 87 Misc 2d 717, 723 [Sup Ct, NY County 1976]).
With this background, the court finds no reason to dismiss the breach of fiduciary duty claim.
Based upon the foregoing, the motion is denied.