**BBS POWER MOD, INC., Plaintiff,**

v.

**PRESTOLITE ELECTRIC, INC., et al., Defendants.**

No. 6:97–CV–06263L.

United States District Court, W.D. New York.

Sept. 29, 1999.

David V. DeLuca, Rochester, NY, for BBS Power Mod, Inc., plaintiff.

Loren H. Kroll, Bilgore, Reich, Levine, Kroll & Kantor, Rochester, NY, Bruce T. Wallace, Angela L. Jackson, Anthony P. Patti, Hooper, Hathaway, Price, Beuche & Wallace, Ann Arbor, MI, for Prestolite Electric, Inc., defendant.

Mark L. Belleville, Phillip J. Campanella, Calfee, Halter & Griswold, Cleveland, OH, Bruce T. Wallace, Angela L. Jackson, Anthony P. Patti, Hooper, Hathaway, Price, Beuche & Wallace, Ann Arbor, MI, William Smith, Cleveland, OH, for Apsco, Inc., defendant.

## DECISION AND ORDER

LARIMER, Chief Judge.

Plaintiff, BBS Power Mod, Inc. ("BBS"), commenced this action for breach of contract, fraud and related causes of action in New York State Supreme Court, Ontario County, in May 1997. Defendants, Prestolite Electric, Inc. ("Prestolite") and Apsco, Inc. ("Apsco") removed it to this court on June 6, 1997, invoking this court's diversity jurisdiction under 28 U.S.C. § 1332. Defendants have moved for summary judgment. Plaintiff has cross-moved for summary judgment, and for an order precluding Prestolite from introducing at trial any evidence beyond that already produced by Prestolite regarding damages on Prestolite's counterclaims against BBS.

## FACTUAL BACKGROUND

BBS, a New York corporation with its principal place of business in Victor, New York, is a design and manufacturing company whose specialty is "electronic packaging," which involves using computer-assisted design and manufacturing programs to turn products existing only as designs on paper into actual products. Prestolite manufactures and supplies regulators and alternators for heavy-duty trucks. The regulators control the voltage output from the alternator to the truck battery.

In early 1995, William Kelly, a Prestolite electrical engineer, designed a new type of regulator that would allow a truck driver to adjust the voltage output for optimum vehicle performance. Prestolite decided to hire an outside firm to design the necessary circuit board and to manufacture the new regulators. To that end, Prestolite approached BBS regarding the creation of a layout for the circuit board. BBS thereafter came up with a mechanical design for the regulators, for which Prestolite paid BBS the agreed-upon price of $10,000.

Prestolite then solicited bids for the manufacture of the regulators. Several companies, including BBS and Apsco, submitted bids. BBS submitted the lowest bid, and Prestolite decided to award it the contract.

Representatives of BBS and Prestolite met on September 19, 1995 to work out the details of the contract. On September 25, 1995, Prestolite sent BBS a "letter of intent" memorializing their agreement. The letter stated, *inter alia*, that BBS would be "a supplier of Prestolite C Regulator[s]" to Prestolite. Defendants' Motion for Summary Judgment Ex. I. The letter called for an initial shipment of 1000 regulators on December 1, 1995. It further stated that BBS would produce regulators for one of Prestolite's customers, Freightliner, with "EAU [estimated annual usage, *i.e.*, the quantity to be shipped] estimated at 10K/year," and that "EAU for the remainder of this product line is 100K/year."

Full production of the regulator was "to be no later than 4/96."

Under the heading, "Proprietary Rights," the letter stated:

Prestolite will provide to BBS such technical specifications, drawings and other information as is necessary to permit BBS to manufacture Prestolite's C Regulators. BBS shall have a limited license to use such technological information solely for the purpose of manufacturing such regulators for Prestolite hereunder and shall not have the right to use such technological information for the manufacture of any other product and shall be prohibited from disclosing such technological information to any third party without the prior written consent of Prestolite.

The letter also stated that "[t]he term of this manufacturing agreement shall be three (3) years. The contract can be terminated by either party without cause upon 90 days written notice." *Id.*

At this point begins an ever-widening gap between the two sides' versions of events. BBS claims that Prestolite made a number of changes in the design of the circuit board, which increased BBS's costs, and that BBS discovered flaws in Prestolite's design. Prestolite contends that BBS had grossly overestimated its capabilities to produce this sophisticated product, that BBS took longer than expected to get the project up and running, and that BBS kept raising the cost per unit. Although Prestolite agreed to pay the increased costs, defendants claim that BBS's original bid was simply unrealistically low.

Regardless of the reasons, it is clear that there were some problems with the design that needed to be addressed. One problem in particular involved a physical gap in the regulator, which the design specified was to be filled with an epoxy substance referred to as a "potting compound." The potting compound tended to leak out through a hole in the circuit board housing, however, and so to prevent that from happening, BBS conceived the idea of

fashioning a gasket out of a material sold by a company known as Ray–Chem under the name GelTek.

BBS alleges that it also came up with the idea of a "dome cap," a snap-fit cover over a hole in the casting of the regulator. According to BBS, this eliminated the need for an expensive threaded nylon screw that Prestolite had specified which was designed to act as a dust cover over the hole.

According to defendants, not only was BBS falling behind in its production, in terms of both time and quantity, but the regulators that were manufactured failed with alarming frequency. Prestolite alleges that it therefore responded with interest when Apsco, with whom Prestolite had an ongoing relationship, approached it with a proposal that Apsco manufacture the regulators in place of BBS.

BBS, however, alleges that Prestolite and Apsco had long before conceived a scheme under which Prestolite would supply Apsco with all of BBS's designs and other technological information, with the intent that Prestolite would eventually transfer the manufacture of the regulators from BBS to Apsco. BBS has submitted a copy of a letter from Apsco to Prestolite dated September 1, 1995, containing a "summary of the working relationships" between Apsco and Prestolite. Under the heading "PEI Products" (Regulators), the letter states that "Apsco would manufacture for PEI under standard supplier arrangements."

BBS alleges that Prestolite would have liked to award the contract immediately to Apsco instead of BBS, but that at the time that Prestolite was looking for a supplier, Apsco was not able to "tool up" rapidly enough. BBS claims that defendants therefore decided simply to use BBS to perform the necessary design work. When BBS supplied Prestolite with its designs and revisions, Prestolite allegedly turned them over to Apsco, so that at very little cost and effort to Apsco, Apsco would be able to be in a position to begin produc-

ing the regulators as soon as its manufacturing facilities were ready.

Defendants admit that Prestolite gave Apsco some of BBS's designs, but they allege that those designs contained no proprietary information of BBS, and that far from simply copying the designs, Apsco identified and corrected a number of flaws in the designs.

During 1996, orders for regulators from Prestolite's customers were much lower than had been anticipated. Prestolite alleges that this was because BBS kept raising its prices, and Prestolite could not effectively pass the cost on to its customers, because the customers simply refused to pay the high prices.

In November 1996, BBS submitted a cost claim to Prestolite totaling $219,600. BBS contended that this sum represented its increased costs concerning various matters, *e.g.* overhead and development costs, attributable to low order volumes. Defendants' Motion for Summary Judgment Ex. Q. Prestolite responded by letter dated December 20, 1996, indicating that Prestolite would not agree to pay the amounts requested, but proposing another solution. Prestolite stated that "[t]he failure of BBS to provide product of acceptable quality on a timely basis is a major contributor to the events that led to the cost in question, and may ultimately cost Prestolite far more than the $219,000 [sic] requested by BBS." Defendant's Motion for Summary Judgment Ex. R. After describing some of the problems that Prestolite and its customers had encountered with BBS's regulators, Prestolite stated, "we are not willing to retain BBS as the sole source for the regulators in question," although the letter did not identify any other suppliers that Prestolite intended to use.

Prestolite therefore proposed an alternative solution under which it would purchase about 7000 regulators from BBS during the first quarter of 1997, and pay BBS $40,000 "in settlement of all outstanding claims by BBS." Prestolite called for

BBS to return to Prestolite all "equipment purchased by Prestolite and used by BBS as a part of this project or begin payment to Prestolite fair market rent of $1,000 per month for the use of this equipment." Both Prestolite and BBS would also waive any claims they may have had against each other. *Id.*

In a letter to Prestolite dated January 2, 1997, BBS stated:

In view of the fact that BBS PowerMod does not intend to sign the proposal and waiver which you submitted on 12/20/96, we recommend shipping to your schedule without being bound by the aforementioned submission. This allow [sic] ongoing business to be transacted without interruption temporarily while we can come to an expeditious agreement.

Defendants' Motion for Summary Judgment Ex. S.

Prestolite agreed to those terms, but on January 23, 1997, Jerry E. Sergent, BBS's Chief Executive Officer and President, sent Prestolite another letter, describing the significant costs, totaling over $460,000, that had been incurred by BBS over the life of the project, all of which BBS attributed to Prestolite. Stating that "it is simply not good business practice to continue shipping product which only further consumes our resources," Sergent stated that he had "accordingly directed that all effort on the Prestolite/Leece Neville program be terminated as of January 27, 1997."

On February 5, 1997, Brent Braeges, one of BBS's principals, spoke by telephone with two representatives of Prestolite. BBS alleges that Prestolite sufficiently allayed BBS's concerns so that BBS was willing to continue to do business with Prestolite. On February 6, 1997, Braeges sent Prestolite a letter containing what he believed to be the gist of the February 5 discussion. Braeges stated that BBS "desire[d] to continue the manufacturing relationship with Prestolite," and that BBS "mistook [Prestolite's intention to use another supplier] to mean that Prestolite

wished to stop placing orders with BBS PowerMod." Plaintiff's Cross–Motion for Summary Judgment Ex. 31. Stating that BBS "ha[d] made a considerable investment in the Prestolite regulator product line and wish[ed] to be reimbursed for [its] effort," Braeges stated, "We are willing to transfer ownership of our regulator assembly designs and proprietary processes upon satisfaction of the financial consideration which are documented [sic] in previous correspondence." *Id.*

Prestolite did continue to purchase regulators from BBS for about three months, but around May 1997, ceased placing orders with BBS and began using Apsco as its sole supplier.

Prestolite commenced this action a short time thereafter. The complaint asserts nine causes of action. The first cause of action, asserted against Prestolite only, alleges that Prestolite breached its contract with BBS by failing to purchase as many regulators as called for by the contract. The second cause of action, which is asserted against both defendants, alleges that defendants, by "entering into a manufacturing contract using the proprietary specifications and process developed by BBS," engaged in "an unfair business practice as defined in Section 349 of the General Business Law of the State of New York." Complaint ¶ 23.

The third cause of action states that "[d]efendants, in failing to comply with the terms of the agreements between the parties herein, have caused damage to Plaintiff in the amount of $1,200,000.00 plus interest." Complaint ¶ 26. The fourth cause of action alleges that "[d]efendants by using the proprietary process discovered by BBS without compensation to BBS, have been unjustly enriched in the amount of $1,200,000.00, all to the detriment of plaintiff." Complaint ¶ 28.

The fifth cause of action alleges that "Prestolite and APSCO have converted the work product of BBS for their own use and benefit," thereby damaging BBS in

the amount of $1,200,000. Complaint ¶ 31. The sixth cause of action alleges fraud on the part of Prestolite in that Prestolite misrepresented to BBS that it "would complete the agreement at a part price which would compensate BBS for the time and monies expended in enhancement of the regulator design and manufacture," and that BBS relied on those misrepresentations to its detriment. Complaint ¶ 34. The seventh cause of action also alleges fraud by Prestolite by misrepresenting to BBS that it intended to use BBS as the sole manufacturer and supplier of the regulators for three years.

The eighth cause of action alleges that "Prestolite agreed to share with BBS the profit from the use of the novel design changes and process changes in the manufacture of Prestolite Regulators," and that Prestolite "has breached its fiduciary duty as a co-venturer by sharing such process with the defendant APSCO, Inc. while still under a contract with BBS and by further failing to act in the best interests of the BBS [sic]." Complaint ¶¶ 41, 42. The ninth cause of action alleges that the manufacturing agreement between Prestolite and Apsco violates BBS's proprietary interest in the design and process used to produce the regulators, and demands an accounting of the income, profits and expenses of the business conducted between defendants relating to the production of the regulators.

## DISCUSSION

### I. Claims for Breach of Contract

Counts 1 and 3 of the complaint both allege breach of contract by Prestolite. The first cause of action is premised on the theory that given the letter of intent's reference to estimated volumes of 10,000 units per year for Freightliner, and 100,-000 per year for other accounts, Prestolite committed to purchase 110,000 regulators a year for the three-year life of the contract. The third cause of action does not state how "[d]efendants ... fail[ed] to comply with the terms of the agreements

between the parties ...," Complaint ¶ 26, but it appears to be based on the same set of facts as Count 1. Braeges stated at his deposition that he did not know of any difference between the first and third causes of action, and plaintiff's papers have not identified any separate basis for this claim. Also, despite the reference in Count 3 to "[d]efendants," it is self-evident that BBS cannot assert a claim for breach of contract against Apsco, since BBS never entered into a contract with Apsco.

Defendants contend that these claims should be dismissed because the contract specifically provided that either party could terminate it on ninety days written notice. Prestolite argues that under New York law, which the parties agree controls here, there can be no cause of action for breach of a contract terminable at will. In response, BBS contends that the contract was never effectively terminated, because neither party gave written notice of termination as required by the terms of the contract.

In support of its position, Prestolite contends that there are at least two writings that satisfy the written-notice requirement. The first of these is Prestolite's December 20, 1996 letter to BBS refusing BBS's request of payment of $219,600, and offering to settle all outstanding claims for about $61,000. Prestolite takes the position that it thereby terminated the contract and was proposing an entirely new agreement.

Prestolite also relies on BBS's January 2, 1997 letter to Prestolite. Prestolite does not appear to contend that this letter itself constituted a notice of termination, but states that the letter reflects BBS's awareness that the contract had been terminated by Prestolite, since BBS proposed allowing the parties' dealings with each other to continue "temporarily" until they could "come to an expeditious agreement," which, in Prestolite's view, obviously meant a new agreement altogether.

Prestolite further asserts that even if its December 20 letter was not sufficient, BBS itself terminated the agreement by means of its January 23, 1997 letter to Prestolite. Prestolite notes BBS's statement that it had ordered "all effort on the ... program [to] be *terminated* as of January 27, 1997." (Emphasis added.)

BBS contends that none of these writings constituted written notice of termination as required by the contract. BBS asserts that its January 23 letter was simply a demand for adequate assurance under U.C.C. § 2–609.[1] According to BBS, then, the contract remained in effect for the full three years called for by the terms of the contract.

■ After reviewing the record, I find that there are issues of fact concerning whether and when the contract was effectively terminated. Both sides correctly state the law in this regard. Plaintiff is correct that under New York law, failure to observe the notice requirements of a termination clause will render an attempted termination invalid. *See Solieri v. Ferrovie Dello Stato Spa,* No. 97 CIV. 8844, 1998 WL 419013 *3 (S.D.N.Y. July 23, 1998); *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.,* 933 F.Supp. 347, 352 (S.D.N.Y.1996). Defendant is likewise correct that when a contract is expressly made terminable at will upon notice by either party, a party's termination of the contract cannot give rise to a cause of action for breach of contract on the theory that the party has failed to perform its obligations under the contract. *See American Food & Vending Corp. v. International Business Machines Corp.,* 245 A.D.2d 1089, 667 N.Y.S.2d 545 (4th Dep't

1997), *leave to appeal dismissed,* 91 N.Y.2d 956, 671 N.Y.S.2d 716, 694 N.E.2d 885 (1998); *Hampton Navigation, Inc. v. Pinpoint Sys. Int'l,* 245 A.D.2d 485, 486, 666 N.Y.S.2d 705 (2d Dep't 1997).

■ In the case at bar, however, I cannot determine as a matter of law whether Prestolite's December 20 letter or BBS's January 23 letter constituted written notices of termination as required by the contract. Certainly they both indicated that the parties' relationship was in jeopardy, but neither expressly stated that the sender was exercising its right to terminate the contract. Although BBS's letter did use the word "terminated," that was in reference to BBS's "effort on the ... program," and the fact that the parties continued to negotiate is at least some evidence that they did not consider their contractual relationship to be completely dead at that point. It is possible that they did, of course, but these are factual matters relating to the parties' intent that are not resolvable on motions for summary judgment. *See McCabe v. Allstate Ins. Co.,* 260 A.D.2d 850, 688 N.Y.S.2d 764, 766 (3d Dep't 1999) ("the dispositive issue is whether the contract was terminated. This issue, which is clearly in dispute, constitutes a material question of fact precluding summary judgment in either party's favor"); *Boston Concessions Group v. Criterion Ctr. Corp.,* 250 A.D.2d 435, 673 N.Y.S.2d 111 (1st Dep't 1998) ("Concerning the breach of contract cause of action, numerous issues of fact exist, including ... the validity of defendant's termination ...").[2]

**1.** § 2–609. Right to Adequate Assurance of Performance

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

**2.** I also note that although the sixth and seventh causes of action are pleaded solely as fraud claims, plaintiff now contends that they "sound in tort as well as in contract." Plaintiff's Memorandum of Law ¶ 98. The issues relating to these claims will be dealt with elsewhere in this Decision and Order.

## II. Claims Relating to BBS's Alleged Proprietary Interest

Counts 2, 4, 5 and 9 all relate to defendants' alleged use of BBS's proprietary information, processes and inventions, particularly the GelTek gasket and the dome cap. Here, too, I find that factual issues exist precluding summary judgment in either party's favor.

Before turning to the merits of these causes of action, I note that in its brief, plaintiff states that it is withdrawing the second cause of action as to Prestolite, and withdrawing the reference in Count 2 to N.Y.Gen.B.L. § 349, thus leaving this claim as a claim against Apsco for unfair business practices based on Apsco's alleged unfair competition and tortious interference with BBS's contractual relations with Prestolite. It also states that "[t]his cause of action raises questions of fact vis-a-vis APSCO, which has not moved for summary judgment herein." Plaintiff's Memorandum of Law ¶ 84. Plaintiff does not discuss the merits of this cause of action any further.

I do not agree with BBS that Apsco has not moved for summary judgment, however. Both Prestolite and Apsco are represented by the same counsel, and defendants' notice of motion and other motion papers clearly state that the motion is brought of behalf of defendants. It is true that defendants' papers contain little discussion of Apsco's role in the underlying events, but that is likely because Prestolite was the main player. In general, if Prestolite did nothing wrong, such as misappropriate BBS's proprietary information, Apsco could not be held liable either, since it allegedly obtained that information from Prestolite.

I am also not persuaded that BBS can simply turn this cause of action into a claim for tortious interference with contract. It is not pleaded as such, but is based on defendants' joint use of BBS's proprietary information.

A common-law claim for unfair business practices or unfair competition and a claim for tortious interference with contract are two different things. Under New York law, "the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets." *Eagle Comtronics, Inc. v. Pico Products, Inc.,* 256 A.D.2d 1202, 1204, 682 N.Y.S.2d 505 (4th Dep't 1998), *leave to appeal denied,* 688 N.Y.S.2d 372 (4th Dep't 1999); *see Forschner Group, Inc. v. Arrow Trading Co.,* 124 F.3d 402, 408 (2d Cir.1997). In contrast, the elements of a claim for tortious interference with contract are: the existence of a valid contract; the tortfeasor's knowledge of the contract and intentional interference with it; the resulting breach; and damages. *Hoag v. Chancellor, Inc.,* 246 A.D.2d 224, 228, 677 N.Y.S.2d 531 (1st Dep't 1998). Plaintiff cannot plead one claim and then, in response to a motion for summary judgment, declare that it is an entirely different claim from the one pleaded.

Misappropriation of trade secrets, however, is one type of unfair competition. *Eagle Comtronics,* 256 A.D.2d at 1204, 682 N.Y.S.2d 505; *see also* 2 New York Pattern Jury Instructions, 1999 Cumulative Supplement at 373 (outlining six categories of unfair competition, including trade secrets and misappropriation). To the extent that Count 2 is based on Apsco's alleged misappropriation of BBS's trade secrets, therefore, it does state a claim on its face. That claim and Count 4 may be duplicative of each other, but Apsco will not be prejudiced if both of them are allowed to proceed.

Although the complaint does not use the term "trade secret," in effect BBS is alleging that defendants have misappropriated its trade secrets, and indeed both parties discuss the claims with reference to New York law as it relates to trade secret claims. In determining whether informa-

tion qualifies as a trade secret, courts generally consider the following factors:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 123, 672 N.Y.S.2d 8, 15 (1st Dep't 1998) (quoting Restatement of Torts, § 757, comment b).

■ In the case at bar, I find that questions of fact exist regarding whether the information in question did constitute trade secrets. One issue is the novelty of the inventions themselves. BBS contends that its development of the gasket and dome cap were rather ingenious, whereas defendants assert that these were obvious solutions. In addition, although these are tort claims, there are also issues here related to the contract between BBS and Prestolite. In particular, it is not clear what their intent was concerning what if any proprietary rights BBS would have in any information or inventions relating to the regulators. Both sides point to the contract's provision that BBS would have a very limited right to use information supplied to it by Prestolite, but they draw very different inferences from that provision. BBS argues that since it deals only with Prestolite's proprietary interests, the contract is simply silent concerning BBS's rights with respect to its own proprietary information. Defendants, on the other hand, contend that this provision demonstrates that *all* information, inventions, or processes developed during the project were intended to be the sole property of Prestolite.

These are clearly issues of fact that cannot be resolved on a motion for summary judgment. Accordingly, both sides' motions for summary judgment on these claims are denied. *See Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) ("a trade secret must first of all be a secret; whether it is [is] generally a question of fact"); *U.S. Reinsurance Corp. v. Humphreys*, 240 A.D.2d 264, 667 N.Y.S.2d 2 (1st Dep't 1997) (defendant's motion for summary judgment was properly denied, because there were issues of fact relevant to whether information plaintiff sought to enjoin defendant from disclosing constituted trade secrets); *Engleman v. David McKay Co.*, 73 A.D.2d 511, 422 N.Y.S.2d 95 (1st Dep't 1979) (motion for summary judgment on misappropriation of trade secrets claim was properly denied, since issue of fact was presented as to whether certain disclosures by plaintiffs "contained specific and concrete information sufficient to constitute a property right warranting judicial protection").

## III.  Fraud Claims

Counts 6 and 7 both allege fraud on the part of Prestolite. Count 6 is based on Prestolite's refusal to agree to pay increased costs during the project. BBS alleges that Prestolite had fraudulently represented to BBS that it would pay a price that would be sufficient to completely cover BBS's costs. Count 7 alleges that Prestolite misrepresented to BBS that it would use BBS as its sole manufacturer and supplier of the regulators for three years.

■ To establish a cause of action for fraud under New York law, a plaintiff must establish four elements: (1) misrepresentation of a material fact; (2) scienter; (3) justifiable reliance; and (4) injury or damages. *Matter of Garvin*, 210 A.D.2d 332, 333, 620 N.Y.S.2d 400 (2d Dep't 1994). I find that questions of fact exist with respect to several of these elements.

First, the existence of a misrepresentation is itself at issue. The parties present diametrically opposed versions of what promises, if any, Prestolite gave to BBS regarding costs and the exclusivity of their arrangement. In addition, the states of mind of both Prestolite and BBS are at issue: whether Prestolite acted with fraudulent intent, and whether BBS relied on Prestolite's misrepresentations. Summary judgment is frequently inappropriate on claims involving a party's state of mind, and it is inappropriate here. *See On Ling Lam v. Wing Woh Lung Co., Inc.*, 181 A.D.2d 495, 496–97, 581 N.Y.S.2d 308 (1st Dep't 1992) (defendants were not entitled to summary judgment dismissing causes of action sounding in fraud, since record clearly established that there were material issues of fact, particularly with respect to scienter and reliance); *Neydavood v. Zorzy*, 123 A.D.2d 847, 849, 507 N.Y.S.2d 461 (2d Dep't 1986) (same); 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2730 at 7 (3d ed. 1998) ("Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable people might differ—a function traditionally left to the jury—summary judgment often will be an inappropriate means of resolving an issue of this character").

## IV. Claim for Breach of Fiduciary Duty

In Count 8 of the complaint, plaintiff alleges that "Prestolite agreed to share with BBS the profit from the use of the novel design changes and process changes in the manufacture of Prestolite Regulators," and that Prestolite "has breached its fiduciary duty as a co-venturer by sharing such process with the defendant AP-SCO, Inc. while still under a contract with BBS and by further failing to act in the best interests of the BBS [sic]." Defendants contend that there is no evidence to support this claim, and that plaintiff cannot show that Prestolite owed any fiduciary duty to BBS.

"A conventional business relationship does not create a fiduciary relationship in the absence of additional factors...." *RKB Enterprises Inc. v. Ernst & Young*, 182 A.D.2d 971, 972, 582 N.Y.S.2d 814 (3d Dep't 1992). Those factors generally relate to the superior position of one party (typically the defendant), such that the plaintiff must place its trust and confidence in the defendant. "A fiduciary relationship generally must arise out of a relationship of confidence, trust, or superior knowledge or control, and may exist where one entity 'is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.'" *Broadway Nat. Bank v. Barton–Russell Corp.*, 154 Misc.2d 181, 197, 585 N.Y.S.2d 933 (1992) (quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672 (1st Dep't 1987) (citations omitted)). In determining whether a fiduciary relationship existed, "[b]eyond what may be memorialized in writing, a court will look to whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Wiener*, 672 N.Y.S.2d at 14.

In the instant case, I find that plaintiff has failed to allege facts from which a fiduciary relationship could be inferred. The fact that some of the information that passed between the parties may have been considered confidential by one or both parties does not alter the fact that they had an arm's-length business relationship. To the extent that Prestolite might have breached any duty it owed to BBS to maintain the confidentiality of such information, plaintiff has an adequate remedy through its other causes of action. Plaintiff's eighth cause of action is therefore dismissed. *See Surge Licensing, Inc. v. Copyright Promotions Ltd.*, 258 A.D.2d 257, 685 N.Y.S.2d 175, 176 (1st Dep't 1999) ("The parties' agreement, premised as it was upon a conventional business relationship and establishing at arms length no

more than routine ... rights and obligations, did not implicate or give rise to a fiduciary relationship"); *Prestige Foods, Inc. v. Whale Securities Co.*, 243 A.D.2d 281, 282, 663 N.Y.S.2d 14 (1st Dep't 1997) ("Nor did this conventional business relationship give rise to a claim of fiduciary duty such as might justify a claim of reliance"); *V. Ponte and Sons, Inc. v. American Fibers Int'l*, 222 A.D.2d 271, 272, 635 N.Y.S.2d 193 (1st Dep't 1995) ("The counterclaim sounding in breach of fiduciary duty was properly rejected, as defendants have pleaded only an arm's length business transaction without special circumstances which might give rise to a fiduciary relationship").

### V. Plaintiff's Motion to Preclude Prestolite from Presenting Additional Evidence of Damages

Plaintiff has also moved to preclude Prestolite from presenting any proof at trial relating to its damages on Prestolite's counterclaim for damages allegedly incurred as a result of defective regulators supplied to Prestolite by BBS, beyond that already disclosed to BBS in discovery. In response, Prestolite agrees to be limited to its disclosures in this regard during discovery, but states that it "reserve[s] the right, as is customary, to update the information as necessary prior to trial upon reasonable notice to plaintiff's counsel." Defendants' Reply Memorandum of Law at 21. Plaintiff objects to this, stating that discovery is closed and that there is no need to "update" anything with respect to damages, since whatever damages Prestolite has suffered lie entirely in the past.

While I harbor some doubts about whether there could be any need to "update" the information concerning damages, I will not absolutely foreclose Prestolite from at least offering further evidence of damages in the future. If Prestolite does so, I can certainly address any objections that BBS has in terms of prejudice or admissibility at that time. I will therefore deny BBS's motion, but without prejudice to future objections by BBS to any offers of additional evidence of damages that Prestolite may make in the future.

### CONCLUSION

Defendants' motion for summary judgment (Docket Item 29) is granted in part and denied in part. Plaintiff's Eighth Cause of Action is dismissed. In all other respects, defendants' motion is denied.

Plaintiff's cross-motion for summary judgment (Docket Item 31) is denied. Plaintiff's motion to preclude BBS from offering evidence of damages on Prestolite's counterclaim, beyond what Prestolite has already turned over to BBS during discovery (Docket Item 31) is denied without prejudice.

IT IS SO ORDERED.